## DUNN v LEDERLE LABORATORIES

Docket No. 60229. Submitted August 4, 1982, at Detroit.—Decided
November 3, 1982. Leave to appeal applied for.

Betty Dunn contracted polio after her daughter had been given
Sabin oral polio vaccine produced by Lederle Laboratories.
Betty Dunn and her husband, Thomas, brought an action in
Wayne Circuit Court against the doctor who gave the vaccine
and Lederle based upon a failure to warn them of the hazards
of the contact polio which could result from the use of the
Sabin vaccine. Lederle's defense was that their warnings were
adequate, and, in any event, any inadequacy in their warning
was not the proximate cause of Mrs. Dunn's contracting the
disease. The plaintiffs settled with the doctor during trial. The
doctor testified that he was aware of the possible danger of
contact polio but decided that because of the low risk factor he
would not inform Mrs. Dunn of the danger. The jury returned a
verdict in favor of defendant Lederle. Plaintiffs moved for a
judgment notwithstanding the verdict or for a new trial. Ro-
land L. Olzark, J., denied the motion. Plaintiffs appeal. *Held:*

1. Unavoidably unsafe products must be marketed with ade-
quate warnings of their dangers. Because of the possible risk of
contracting contact polio, the Sabin polio vaccine is unavoid-
ably unsafe. The vaccine's benefits, however, are such that it
would be counterproductive to ban the drug.

2. A manufacturer has no duty to include in its warning of a

REFERENCES FOR POINTS IN HEADNOTES

[1] 63 Am Jur 2d, Products Liability § 133.

[2] 63 Am Jur 2d, Products Liability § 175.

[3, 4, 7-9] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 49, 50.
  63 Am Jur 2d, Products Liability § 47.
  Liability of manufacturer or seller for injury or death allegedly
    caused by failure to warn regarding danger in use of vaccine or
    prescription drug. 94 ALR3d 748.
  Manufacturer's or seller's duty to give warning regarding product
    as affecting his liability for product-caused injury. 76 ALR2d 9.

[5] 63 Am Jur 2d, Products Liability §§ 42, 53, 133.

[6] 63 Am Jur 2d, Products Liability § 52.

[10] 81 Am Jur 2d, Witnesses § 74.

possible danger from its product instructions on how to avoid that danger.

3. The testimony that the doctor who administered the vaccine did so with knowledge of the danger of contact polio and decided not to warn Mrs. Dunn of the danger provided an adequate factual basis for the jury to find that the failure, if any, of Lederle to provide an adequate warning was not the proximate cause of Mrs. Dunn's contracting of polio.

Affirmed.

1. PRODUCTS LIABILITY — PRODUCT WARNINGS — UNAVOIDABLY UNSAFE PRODUCTS.

Unavoidably unsafe products must be marketed with adequate warnings of their dangers.

2. PRODUCTS LIABILITY — SABIN POLIO VACCINE — UNAVOIDABLY UNSAFE PRODUCTS.

The Sabin live virus polio vaccine is an unavoidably unsafe product since there are risks inherent in its use but its benefits are such that it would be counterproductive to ban the drug.

3. PRODUCTS LIABILITY — PRODUCT WARNINGS — PRESCRIPTION DRUGS.

Product warnings generally must be calculated to reach the ultimate consumer of the product; however, as to drugs dispensed in a manner requiring a physician to weigh the risks and benefits of the drug's use on a particular patient, the warnings may be directed by the manufacturer to the doctor rather than the patient.

4. DRUGS AND NARCOTICS — PRODUCTS LIABILITY — PRODUCT WARNINGS — NEGLIGENCE.

A manufacturer of a prescription drug has a legal duty to warn the medical profession of any risks inherent in the use of the drug which the manufacturer knows or should know to exist; in the context of a negligence claim the warnings must be examined as to their reasonableness under the circumstances.

5. PRODUCTS LIABILITY — PRODUCT WARNINGS.

A product warning need not contain instructions on how to avoid the danger posed by the product.

6. PRODUCTS LIABILITY — SUPERSEDING NEGLIGENCE — FORESEEABILITY.

Superseding negligence of a doctor relative to his use of a prescription drug which is not foreseeable by the manufacturer

of the drug may relieve the manufacturer from liability based upon the failure to provide an adequate warning.

7. PRODUCTS LIABILITY — PRESCRIPTION DRUGS — PROXIMATE CAUSE — MEDICAL MALPRACTICE — PRODUCT WARNINGS.

The decision of a doctor to use a prescription drug despite the possible danger presented by the use of the drug or to not warn the patient of that possible danger need not rise to the level of malpractice to break the chain of proximate causation so as to relieve the manufacturer of the drug from liability based upon the failure to provide adequate warnings.

8. PRODUCTS LIABILITY — PRESCRIPTION DRUGS — PRODUCT WARNINGS — EVIDENCE — PROXIMATE CAUSE.

A plaintiff seeking recovery from a manufacturer of prescription drugs on the basis of inadequate warnings must show that an adequate warning would have altered the prescribing doctor's decision to use and his conduct concerning the use of the drug; otherwise, the failure to provide an adequate warning cannot be said to be the proximate cause of the plaintiff's injury.

9. PRODUCTS LIABILITY — PRESCRIPTION DRUGS — PRODUCT WARNINGS — EVIDENCE — PROXIMATE CAUSE.

A verdict in favor of the manufacturer of a prescription drug on a claim of inadequate product warnings is supported by the evidence where the proofs showed that the prescribing doctor knew of the possible dangers from the use of the drug and chose to prescribe the use of the drug without informing the patient of the possible danger, since under such circumstances the adequacy of the drug manufacturer's warning could be found not to have been a proximate cause of the resulting injury.

10. TRIAL — WITNESSES — WITNESS LISTS.

A trial court's decision to allow a witness, who was not listed on the witness list prior to trial, to testify at trial is largely a matter of discretion.

*Charfoos, Christensen, Gilbert & Archer, P.C.* (by *Adrienne G. Southgate* and *Harriet Morman),* for plaintiff.

*James S. Goulding,* for defendant.

Before: N. J. KAUFMAN, P.J., and WAHLS and

M. E. Clements,* JJ.

N. J. Kaufman, P.J. In 1974 plaintiffs, Betty and Thomas Dunn,[1] took their daughter Stephanie to a doctor for her baby shots. The doctor gave Stephanie Orimune, the Sabin vaccine manufactured by defendant Lederle Laboratories, a division of American Cyanamid Company. Soon after, Mrs. Dunn became ill. Polio was diagnosed.

The Dunns sued the doctor and Lederle for failure to warn of the hazards of contact polio. After the doctor testified at trial, plaintiffs settled their case against him. The case against Lederle proceeded, and a Wayne County Circuit Court jury found for the defendant Lederle. Plaintiffs' motion for judgment notwithstanding the verdict or, in the alternative, new trial was denied. Plaintiffs appeal from this denial.

Lederle admitted at trial that it knew of contact polio as early as 1966. Lederle also admitted that Mrs. Dunn was infected with polio as a result of contact with her daughter. The primary defense was that, even if its warnings were inadequate, the failure to adequately warn was not the proximate cause of Mrs. Dunn's disease. We conclude that the jury could reasonably find for the defendant on this theory. The trial judge therefore did not abuse his discretion by denying the motion for judgment notwithstanding the verdict or new trial.

I

Poliomyelitis, or polio, is caused by a virus which enters the body orally and reproduces rapidly in the intestinal tract. The virus then spreads to the spinal column, damaging the nervous sys-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] We will refer to Betty and Thomas Dunn as "plaintiffs". "Plaintiff" singularly means Betty Dunn.

tem and causing muscular paralysis.[2] In 1952, before a vaccine was developed and marketed, there were 57,879 reported polio cases in the United States. Crippling paralysis resulted in 21,-269 cases.[3]

In 1949 a Harvard doctor, Enders, discovered a process for creating a tissue culture of the virus. This was a major step in the development of a vaccine. By reproducing the virus, chemically killing it, and injecting the killed virus into the human body, another doctor, Salk, invented a vaccine. This vaccine, the "Salk" vaccine, came into common usage around 1955.[4]

In time a live virus vaccine was invented by another doctor, Sabin. The live, or "Sabin", vaccine was preferred over the Salk vaccine for several reasons. First, the Salk vaccine was administered by injection; the Sabin vaccine is taken orally as a drop in a sugar cube. Second, the Salk vaccine required three separate shots followed by booster shots. The trivalent type Sabin vaccine requires only one administration, and no boosters, to combat all varieties of the polio virus.[5] Third, the Salk vaccine did not attack the virus in the intestinal tract, where it reproduces rapidly. As a result, the disease could still easily spread from vaccinated persons to nonimmune persons. The Sabin vaccine, on the other hand, provides intestinal immunity; it kills the virus where it breeds. Coupled with the lack of need for booster shots,

[2] Note, *Mass Immunization Cases: Drug Manufacturers' Liability for Failure to Warn,* 29 Vand L Rev 235, 237 (1976).

[3] *Reyes v Wyeth Laboratories,* 498 F2d 1264, 1269 (CA 5, 1974), *cert den* 419 US 1096; 95 S Ct 687; 42 L Ed 2d 688 (1974).

[4] *Stahlheber v American Cyanamid Co,* 451 SW2d 48 (Mo, 1970).

[5] There are three types of polio virus, desginated Type I, Type II, and Type III. 29 Vand L Rev 237.

permanent immunity is provided. These differences, among others, made the Sabin vaccine more compatible with the nationwide effort to immunize the masses and stop polio.[6]

The Sabin vaccine involves introducing a weakened, but live, virus into the body. The presence of the virus triggers the natural production of antibodies which destroy the weakened virus. These antibodies then immunize the body to naturally occurring wild polio viruses.[7] This use of a live virus led to a controversial finding: the vaccine itself could cause polio.[8] In the 1960s, several people developed polio within 30 days of immunization. A special committee of the United States Public Health Service determined that some of these cases might have been caused by the vaccine.[9] A plausible theory is that these persons lacked the immunity system needed to ward off the virus introduced. Additionally, "contact-type" polio was diagnosed among other patients. Because the live virus vaccine operates in the intestinal tract, some virus is expelled in the feces. Unvaccinated persons coming in contact with the feces of recently vaccinated persons—generally from handling diapers—could develop the disease.[10]

## II

Unavoidably unsafe products must be properly marketed with adequate warnings of their dangers. See *Calabrese v Trenton State College,* 162

[6] 29 Vand L Rev 238; Franklin & Mais, *Tort Law and Mass Immunization Programs: Lessons from the Polio and Flu Episodes,* 65 Calif L Rev 754, 765 (1977).

[7] *Stahlheber v American Cyanamid Co,* 451 SW2d 51.

[8] 65 Calif L Rev 758, fn 14; 29 Vand L Rev 239.

[9] 29 Vand L Rev 239. See *Reyes v Wyeth Laboratories, supra.*

[10] See *Givens v Lederle,* 556 F2d 1341 (CA 5, 1977).

NJ Super 145; 392 A2d 600, 604 (1978), *aff'd* 82 NJ 321; 413 A2d 315 (1980) (rabies vaccine). The polio vaccine is an unavoidably unsafe product; there are certain risks inherent in its use, yet its benefits outweigh these risks so greatly that it would be counterproductive to ban the drug. *Reyes v Wyeth Laboratories,* 498 F2d 1264, 1273 (CA 5, 1974), *cert den* 419 US 1096; 95 S Ct 687; 42 L Ed 2d 688 (1974) (polio vaccine). To maximize safety, then, some kind of warning may be required.

Warnings generally must be calculated to reach the ultimate consumer. An exception exists for drugs dispensed in a manner requiring a physician to weigh the risks and benefits of a drug's use on a particular patient. *Smith v E R Squibb & Sons, Inc,* 405 Mich 79, 88; 273 NW2d 476 (1979).[11] With these drugs the doctor, and not the patient, must be warned by the manufacturer.

The manufacturer must adequately warn of dangers it knows or had reason to know of. 2 Restatement Torts, 2d, § 388, pp 300-301.[12] In this respect,

[11] See also *Formella v Ciba-Geigy Corp,* 100 Mich App 649, 655; 300 NW2d 356 (1980), *lv den* 411 Mich 995 (1981), discussed *infra,* section IV, and *Reyes v Wyeth Laboratories,* 498 F2d 1276.

If a doctor's discretion is not called upon, *e.g.,* through mass immunizations or nonprescription drugs, warnings must be calculated to reach the ultimate consumer. *Smith v E R Squibb & Sons,* 405 Mich 88; *Davis v Wyeth Laboratories,* 399 F2d 121, 131 (CA 9, 1968). Because this case involves a single immunization to a single patient, administered by a physician, we hold that Lederle's duty to warn in this case extends only to the doctor. See also *Givens v Lederle,* 556 F2d 1345.

[12] Section 388, which is a restatement of the common law, states:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

the manufacturer is held to the knowledge of an expert and is presumed to know of scientific studies and articles concerning the safety of its products. *Borel v Fibreboard Paper Products Corp,* 493 F2d 1076, 1089 (CA 5, 1973), *cert den* 419 US 869; 95 S Ct 127; 42 L Ed 2d 107 (1974); *Krug v Sterling Drug, Inc,* 416 SW2d 143, 149 (Mo, 1967). Taking this knowledge into consideration, the adequacy of a warning is an issue of reasonableness. *Smith v E R Squibb & Sons, supra,* 90. Reasonableness is a question of fact.

## III

Plaintiffs' first claim on appeal is that the jury could not find Lederle's warning adequate because any warnings given did not disclose how to avoid contact polio. We do not intend to second-quess the jury on the reasonableness of Lederle's warnings. Even if the warnings were inadequate, the jury could find that the failure to warn was not the proximate cause of plaintiff's injury.[13] Plaintiffs'

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

A manufacturer is not required to warn of "obvious" dangers. *Fisher v Johnson Milk Co, Inc,* 383 Mich 158, 160; 174 NW2d 752 (1970). A related concept, often erroneously expressed in terms of "duty", is that if a person already knows of the danger (generally through specialized knowledge) but acts in a manner causing harm, failure to warn him of the danger is not the proximate cause of the harm he inflicts. *Formella v Ciba-Geigy Corp, supra.*

This distinction is important because it sets a limit on this decision. We do not hold that Lederle had no duty to warn doctors of the risk of contact polio. Instead, we hold that no matter what Lederle's duty, the jury could find that the essential element of proximate cause was lacking because the doctor already knew of the danger a warning would cover. Had plaintiffs' daughter been vaccinated by a doctor who did not know of the risks, Lederle's liability may have been established, although its duty would not have been altered.

[13] See Section IV *infra.*

The inserts accompanying the vaccine and reprints of information

argument on the proper scope of warning, however, deserves comment.

Plaintiffs cite no authority for the proposition that a warning must include instructions on how to avoid a danger. Our search of the law also reveals no authority.[14] This is understandable for many reasons. A danger is often avoided simply by refusing to use the dangerous product. Of course, this option was not available to the plaintiff, her daughter, or her doctor.[15] Second, a "danger" is many things to different people. Especially with drugs, the danger can vary from person to person. Some people are more sensitive to certain drugs than are others; thus, methods of avoiding the danger may vary depending on the user's susceptibility to danger and the type of reaction suffered. This leads, to another reason: sensory overload. Commentators have cautioned that excessive warnings on product labels may be counterproductive. See Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Product Liability—Design Defect Litigation Comes of Age,* 61 Cornell L Rev 495, 514-517 (1976):

"The unexamined premise that warnings are not costly in risk-utility balancing is, in our considered opinion, highly questionable. Warnings, in order to be effective, must be selective. They must call the consumer's attention to a danger that has a real probability of occurring and whose impact will be significant. One must warn with discrimination since the consumer is

[14] See 2 Restatement Torts, 2d, § 388(c), reprinted in fn 12, *supra.*

[15] See MCL 329.501 *et seq.;* MSA 14.378(1) *et seq.,* repealed by 1978 PA 368, § 25101 and replaced by MCL 333.9205; MSA 14.15 (9205) and 1979 AC, R 325.231 *et seq.*

from the Physician's Desk Reference (PDR) were admitted into evidence at trial. Some contained warnings of the incidence of contact polio, and some did not. None instructed doctors to warn their patients of the risks.

being asked to discriminate and to react accordingly. The story of the boy who cried wolf is an analogy worth contemplating when considering the imposition of a warning in a case of rather marginal risk. These considerations are of particular significance when considering whether a warning should be imposed or a design change mandated in a products liability case. Those who argue for warning as *the* judicial solution to latent defect cases labor under a naive belief that one can warn against all significant risks. The truth is that such a marketing scheme is not feasible. The warning process, in order to have impact, will have to select carefully the items which are to become part of the consumer's mental apparatus while using the product. Making the consumer account mentally for trivia or guard against risks that are not likely to occur imposes a very real societal cost. Even when the risks are significant, one must consider whether the consumer will perceive them as significant. If the only way to ensure that the consumer will consider them significant is to oversell the warning by increasing its intensity, one may again face the problem that all warnings will come into disrepute as overly alarming. This does not mean that warnings do not have a major role to play in the area of product safety. It does mean, however, that there is a real question as to which dangers must be warned against and which dangers should be designed out of products. Furthermore, for every danger that is designed out it may become possible to warn against others that still remain as potentially dangerous.

\* \* \*

"In short, when calculating the burden of precaution which is part of the risk-utility calculus, it will be necessary to focus on costs other than the cost of label printing. The efficacy of warning is a societal cost of substantial importance. Thus, it will not be possible for the courts to rely on warnings alone to ensure product safety. The range of risks are so broad, and the type of consumer response so varied, that the courts cannot avoid asking 'what is a reasonably safe product' or 'how much product safety is enough.' The answers will sometimes lie with an adequate warning, sometimes with redesign of the product, but most often with warning

and design blended together to give an adequate level of safety." (Footnotes omitted.)

Considering the slight risk of contact polio,[16] the variability of risks of harm (depending on many personal factors, including cleanliness and frequency and type of contact with a recently vaccinated child), the introduction of individualized medical judgment,[17] and the other policy reasons outlined, we do not accept plaintiffs' invitation to add new requirements to a manufacturer's duty to warn. From the trial court's accurate statement of the law the jury could find for defendant.

## IV

Plaintiffs' second claim is that the jury's verdict was erroneous because plaintiffs presented a prima facie case for liability and the evidence presented by Lederle was insufficient to negate liability. Plaintiffs argue that only superseding negligence by the doctor could break the chain of proximate cause and that this was not shown. It is true that superseding negligence not reasonably foreseeable by the manufacturer may offer relief from liability.[18] In *Formella v Ciba-Geigy Corp,* 100 Mich App 649; 300 NW2d 356 (1980), *lv den* 411 Mich 995 (1981), this Court affirmed a trial court's directed verdict of no cause of action. The doctor in *Formella* testified that he read the reprint of the label

---

[16] The testimony at trial indicated that the incidence of contact polio was between one in five million (the rate for all vaccine-related polio cases) and one in ten million.

[17] *Cf. Calabrese v Trenton State College,* 162 NJ Super 145; 392 A2d 600, 604-605 (1978), *aff'd* 82 NJ 321; 413 A2d 315 (1980).

[18] If the intervening negligence is foreseeable by the manufacturer, the manufacturer may still be liable. *Richards v Upjohn Co,* 95 NM 675; 625 P2d 1192, 1196 (Ct App, 1980), *lv den* 94 NM 675; 615 P2d 992 (1980).

for the drug Tandearil in 1965 when he first prescribed the drug. He did not look again at the Physician's Desk Reference (PDR) manual for updates on the drug's safety. Instead, he relied on the statements of the manufacturer's detail men (company representatives) that "Tandearil was a good drug 'with a safety margin' ". 100 Mich App 653. This Court said:

"It is obvious from Dr. Murguz's testimony that he knew Tandearil, like all prescription drugs, has some dangers that must be guarded against by the physician. He knew that taking Tandearil for a lengthy period of time could cause blood dyscrasia, yet he never conducted a blood test on Mrs. Formella or read the PDR. Indeed, he knew from the moment Mrs. Formella phoned him, describing the symptoms, that she had contracted the disease from taking Tandearil.

"We conclude from his testimony that the negligence of Dr. Murguz is the intervening independent and sole proximate cause of Mrs. Formella's injuries. Even if Ciba-Geigy had been negligent in overpromoting the use of the drug through its detail men, that negligence was not the proximate cause of Mrs. Formella's injury. *Love v Wolf,* 226 Cal App 2d 378; 38 Cal Rptr 183, 196 (1964). Dr. Murguz simply chose to ignore what he knew: that the use of Tandearil over several weeks could cause blood dyscrasia." 100 Mich App 653-654.

See also *Dyer v Best Pharmacal,* 118 Ariz 465; 577 P2d 1084 (Ct App, 1978).

Plaintiffs argue a fallacy, however, when they state that a doctor's conduct must rise to the level of malpractice to destroy the chain linking Lederle's failure to warn with Mrs. Dunn's disease. Many unforeseeable intervening forces destroy causation and negate liability. See Prosser, Torts (3d ed), § 51, pp 321-324. These forces do not have to be tortious forces. *Id.* Lederle argues that the doctor's conduct, whether tortious or not, pre-

vented Lederle's possible lack of adequate warning from proximately causing Mrs. Dunn's polio. The evidence supports this theory.

Plaintiffs must show that an adequate warning would have prevented the disease by altering the doctor's conduct. *Stanback v Parke, Davis & Co,* 657 F2d 642 (CA 4,1981), *aff'g* 502 F Supp 772 (WD Va, 1980). Otherwise, the failure to warn is not the proximate cause of injury. In *Stanback* the treating physician testified that he knew of the risk of disease associated with the use of a flu vaccine (although he did not read the package insert accompanying the vaccine) and that it was not his practice to warn his patients of those dangers. 657 F2d 644. The federal court of appeals for the fourth circuit held that under the facts of the case there was

"not sufficient evidence of causation to allow the question to be put to the trier of fact. * * * Whatever may be said about [the doctor's] policies and decisions from the standpoint of the patient, it is clear that they precluded Parke-Davis' failure to warn from having any effect whatsoever on Mrs. Stanback's injury." 657 F2d 645.

Despite the risks associated with the flu vaccine, the evidence in *Stanback* showed that, even if the manufacturer would have warned the doctor, the patient would still have received the vaccination and would not have been informed of the risk. *Id.*

Similarly, in *Douglas v Bussabarger,* 73 Wash 2d 476; 438 P2d 829 (1968), the Washington Supreme Court held that a physician's actions precluded a drug manufacturer from being liable for failure to warn of dangers inherent in the drug's use. The doctor testified that he did not read the label of an anesthetic he used and that he relied on his per-

sonal knowledge when choosing anesthetics. Even if the manufacturer inadequately warned of dangers, the court reasoned, this failure "was not a proximate cause of plaintiff's disabilities". 438 P2d 831. *Cf. Mulder v Parke Davis & Co* 288 Minn 332; 181 NW2d 882 (1970).

In the case at bar, plaintiff's doctor testified that he read a 1965 Orimune label prescribing the necessary dosage. This label was printed before Lederle's admitted knowledge of contact polio. After the 1965 label, the doctor quit reading the inserts and PDR reprints. Thus, further notice by way of drug labels would not have altered the doctor's conduct. Additionally, the use of detail men and "Dear Doctor" letters calculated to reach those doctors who no longer read Orimune labels would have been ineffective in plaintiff's case. The doctor testified that he knew a risk of contact polio existed and that the risk was small:

"*Q.* * * * just prior to the recess I was asking you whether or not you have some knowledge relative to the fact that contact polio as we have talked about it so far and have used that term, had been reported as a possible complaint of the oral vaccine; were you aware of that fact?

"*A.* Yes.

"*Q.* Were you aware of that fact in 1974, when you gave this oral vaccine to Stephanie Dunn?

"*A.* Yes.

"*Q.* Were you aware of the incidence—the statistical possibility—probability—in a general sort of way?

"*A.* That it was extremely rare. One case in multiples of millions."[19]

---

[19] The Special Advisory Committee to the Public Health Service estimated in 1964 that the incidence of all vaccine-related polio was .16 per million doses for Type I polio, .02 per million doses for Type II, and .40 per million doses for Type III. 29 Vand L Rev 239.

He also testified that, with this risk in mind he decided not to warn Mrs. Dunn:

"*Q.* Okay. Doctor, this figure of one in five million that you quoted from and testified to during your deposition in February, are you able to determine from reviewing this package insert as to where you would have gotten such a figure?

"*A.* I would have divided 147,000,000 by 30, which is approximately one to five million.

"*Q.* Now, the next sentence that Mr. Charfoos just asked the judge that I read, I will now read to you. And it says:

'Even though this risk is low, it should always be a source of consideration.'

"Do you see that?

"*A.* I do.

"*Q.* And did you consider the risk at the time?

"*A.* I considered it being very rare.

"*Q.* Okay. And based on your consideration of it, you determined not to give a warning to Mrs. Dunn; is that correct?

"*A.* That's correct.

"*Q.* And was that as you know it, the customary, ordinary and average method utilized by pediatricians at that time with respect to the issue of warning?

"*A.* It was."

From this the jury could find that the doctor's conduct would not have been altered by a different warning. With knowledge of the risks, he designed a course of treatment which included a decision not to warn. No further warnings by Lederle would have added to his knowledge.

The federal court in *Stanback* noted a "judicial inclination" to allow manufacturer liability if the evidence suggests that a physician *might* have heeded an adequate warning. 657 F2d 645. Here, however, the jury could find that reasonable physi-

cians would have acted no differently than did the doctor treating Stephanie Dunn.[20] The doctor testified that, knowing the low incidence of vaccine-associated polio cases, he chose not to warn Mrs. Dunn *and that this was the customary practice in the profession.* Additionally, had the doctor "heeded" an "adequate" warning, the jury could easily find that Stephanie Dunn would nevertheless have been vaccinated, her mother would not have been, and her mother would still have had the contacts with Stephanie which resulted in the contracting of polio.[21]

## V

Plaintiffs next argue that the trial court erred when it allowed Dr. Vallencourt, an employee of Lederle, to testify on defendant's behalf. His name was not on the witness list prepared before trial. Defendant indicated before trial only that it would offer testimony by "representatives of the com-

[20] This analysis assumes, *arguendo,* that the jury found Lederle's warnings inadequate.

[21] The jury could find that Stephanie Dunn would have been vaccinated because the risk of vaccine-related polio is lower than the risk of infection for an unvaccinated person. The jury could find that Mrs. Dunn would not have been vaccinated because adults are more susceptible to vaccine-related Type III polio than to naturally occurring (wild) Type III polio. The government, in fact, recommended excluding adults from mass Type III immunization. *Stahlheber v American Cyanamid Co,* 451 SW2d 58. Lederle's Orimune is a trivalent vaccine offering protection against all polio viruses. Whether individual vaccines for the three types of polio are still produced—so an adult can be vaccinated against Types I and II only—does not appear on the record. The jury could also reasonably infer that Mrs. Dunn would not have avoided all contact with her young daughter or taken greater sanitary measures had she been warned of the risk of contact polio. As discussed earlier, Lederle had no duty to warn how to avoid dangers.

Indeed, these seem like a lot of "what ifs". But they result from a failure of plaintiffs' proofs of proximate cause; if their speculative nature works against any party, it should be against the party obligated to remove the speculation.

pany". Plaintiffs did not object to this lack of specificity. The trial court has great discretion in allowing the testimony of witnesses not on the witness list. *Banks v Wittenberg,* 82 Mich App 274, 277; 266 NW2d 788, *lv den* 403 Mich 809 (1978). The trial court did not abuse its discretion here where the defendant had merely stated that it would produce respresentatives of the company. In addition, the plaintiffs were not harmed by the delayed identification of the witness because they were permitted time to depose Dr. Vallencourt prior to his trial testimony.

Dr. Vallencourt was endorsed as a lay witness, not as an expert. He testified that the federal government's Bureau of Biologics controlled the content of drug labels. Plaintiffs interposed numerous objections during the testimony on grounds of irrelevance and hearsay. The implication of Dr. Vallencourt's testimony, plaintiffs argue, was that the drug manufacturing process is so closely regulated that Lederle could not include a more complete warning because the government would not permit it.[22] After reviewing the records and briefs, we conclude that any error was harmless error. Most of the testimony to which an objection was made was never brought out on defendant's direct examination of the witness because of the continuous objections. Instead, the information was elicited during questioning of the witness outside the presence of the jury (during arguments on the objections), during plaintiff's cross-examination of the witness, and during both parties' examination

---

[22] According to the evidence at trial, the Advisory Committee on Immunization Practices (ACIP) makes recommendations regarding the use of drugs to the Bureau of Biologics. Historically, the Bureau of Biologics followed closely the recommendations of the ACIP, and from 1963 to 1974 the ACIP consistently recommended against immunizing adults as a general practice.

of another witness, defendant's expert. Additionally, defendant's attorney admitted that Lederle never asked the government to allow Lederle to change its Orimune label to allow a warning. Plaintiffs were not precluded from arguing, then, that the government did not prevent the defendant from including a more complete (adequate) warning label or from employing other means (*e.g.,* detail men) to otherwise warn doctors of Orimune's hazards. We find no reversible error on this point.

## VI

Plaintiffs' final contention on appeal is that the defendant's attorney improperly threatened the jury by saying during closing arguments that Lederle is the only domestic producer of the polio vaccine and that if Lederle quits producing it, the public will have to "find it elsewhere, France or Russia". We note first that counsel's remarks were addressed to lessen plaintiffs' prayer for two million dollars damage and not to support an argument that no damages should be awarded even if liability were found. Second, after a review of the record it is safe to say that the attorneys for both parties engaged in frequent verbal jousting. During the defendant's closing argument, for example, plaintiffs' attorney objected ten times and the jury had to be excused twice. Attorneys are normally afforded wide latitude during arguments, but here that latitude was violated and the arguments' flow interrupted numerous times. This contributed to an uncomfortable setting[23] where, perhaps, attorneys said things that they would not have said had they been able to follow their prepared materials.

[23] We do not wish to imply, however, that the trial judge lost control of the proceedings.

Proper jury instructions regarding the statements of attorneys were given. Thus, even though defense counsel's remark may have been improper, we do not believe a new trial is merited.

## CONCLUSION

We believe the jury could find that Lederle's warnings were adequate or, in the alternative, that any failure to warn did not proximately cause Mrs. Dunn's injuries. The trial court did not abuse its discretion by allowing Dr. Vallencourt to testify, and no error requiring reversal appears from the substance of his testimony. Additionally, while defense counsel's closing remarks may have been improper, a new trial is not mandated. The trial court therefore properly denied plaintiffs' motion for judgment notwithstanding the verdict or new trial.

Affirmed.