725 F.2d 1036
 Charles SCHINDLER and Mary Schindler, his wife, individually
and as next friends of Karl Michael Schindler, a
minor, Plaintiffs-Appellants,
v.
LEDERLE LABORATORIES, a division of American Cynamid, Inc.,
and American Academy of Pediatrics, Defendants-Appellees.
 No. 82-1232.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 22, 1983.
 
 1
 Before KENNEDY and WELLFORD, Circuit Judges, and McRAE,* district judge.
 
 
 2
 McRAE, District Judge.
 
 
 3
 Plaintiffs-Appellants, Charles and Mary Schindler, appeal from a judgment of the United States District Court for the Eastern District of Michigan, entered on directed verdicts in favor of defendants-appellees at the close of plaintiffs' proof. For reasons set forth below, we affirm.
 
 
 4
 This action was commenced on June 24, 1977 on behalf of Karl Michael Schindler, a minor, by his parents. In their complaint, plaintiffs alleged that in 1975 Karl received a routine series of doses of oral polio vaccine.[1] This vaccine was produced by defendant Lederle Laboratories and was administered by Karl's pediatrician, Dr. Robert Lugg. Because Karl was suffering from a congenital disease known as agammaglobulinemia[2] at the time he received the polio vaccine, the vaccine caused him to develop poliomyelitis. He has sustained a serious disability as a result.
 
 
 5
 The crux of plaintiffs' case rests on the allegation that the defendants, Lederle Laboratories and the American Academy of Pediatrics, were negligent with regard to their pronouncements to physicians concerning polio vaccines. Specifically, plaintiffs maintain that if the defendants had adequately warned Dr. Lugg of the danger associated with giving the oral polio vaccine to persons suffering from agammaglobulinemia, Dr. Lugg would have not given the vaccine to Karl.
 
 
 6
 In 1973, about 20 months prior to Karl's birth, the Schindler's first son, Jeffrey, died as a result of congenital agammaglobulinemia. Dr. Lugg's partner, Dr. Rady, was Jeffrey's pediatrician during his final illness and he knew that Jeffrey died of agammaglobulinemia. When Karl developed polio in 1976, it was discovered that he likewise suffered from congenital agammaglobulinemia.
 
 
 7
 Prior to Karl's birth, but after Jeffrey's death, Mrs. Schindler expressed fear about whether she should have more children. She consulted physicians at the Children's Hospital of Michigan, her gynecologist, and Dr. Lugg. As a result of these consultations, Dr. Lugg apparently acquired a substantial file concerning Jeffrey's death prior to Karl's birth. This file contained a case summary written by Dr. Rady and Jeffrey's autopsy report. Both of these documents indicated that Jeffrey died from a congenital absence of immunoglobulins. Additionally, the file contained a December 13, 1973 letter from the Director of Clinical Immunology at Detroit's Children's Hospital, Dr. Flossie Cohen, to the Schindler's family physician, Dr. Neruda. In this letter, Dr. Cohen noted that if Jeffrey's agammaglobulinemia was x-linked, "there would be a 50% chance of recurrence in other male offspring." Dr. Cohen also noted that if Jeffrey's disease was the "acquired" type, "male and female offspring will be subject to the same chance of inheriting the condition." Although this letter was in Dr. Lugg's file, he admitted during cross-examination in the trial below that he did not read the letter until after Karl developed polio.
 
 
 8
 When Dr. Lugg assumed treatment of Karl immediately following his birth, Dr. Lugg was aware of the cause of Jeffrey's death. Although Dr. Lugg did not feel that the diagnosis of "x-linked" agammaglobulinemia was conclusive, he testified at the trial that he realized that there was an increased risk that Karl would have agammaglobulinemia. He had "extensive discussions" about this possibility with Mrs. Schindler in May, 1975 before he administered the first dose of oral vaccine.
 
 
 9
 After administering the third and final dose of polio vaccine to Karl on September 3, 1975, Dr. Lugg drew blood from Karl, at the insistence of Mrs. Schindler, to check Karl's gamma globulin levels. He took this blood sample because he was cognizant of Jeffrey's problem and the possibility that Karl might have an immunity deficiency. Dr. Lugg testified that he waited until this time to take a blood sample because, according to the "Janeway-Nelson Text," there is a period of diagnostic uncertainty during the first year of life. The uncertainty apparently arises because it is hard to tell whether the gamma globulins were produced by the mother or child. Dr. Lugg stated that he believed that the only acceptable test available during these early months was performed by a lab in California. Dr. Stanley Schwartz, Karl's treating immunologist and one of plaintiffs' expert witnesses testified, however, that in 1975 there were at least five different gamma globulin tests available for infants at the University of Michigan Medical Center in Ann Arbor and at Children's Hospital in Detroit.
 
 
 10
 The results of Karl's blood test showed that his gamma globulin levels were low when compared with infants of similar age, but Dr. Lugg testified that he was not concerned because Karl was healthy and showed no signs of infection. If Dr. Lugg had recognized that Karl was suffering from agammaglobulinemia, he could have begun administration of gamma globulins or plasma which, according to testimony adduced at trial, might have prevented Karl from contracting polio.
 
 
 11
 Dr. Lugg began administering the oral polio vaccine in the late 1960's or early 1970's. He testified that it was his custom to read the drug company's package inserts when he first uses a product and then he assumes that there is no updating of the product warnings and information unless he hears otherwise from drug company detail men,[3] medical meetings, or other sources. He testified that although he did not read Lederle's package insert accompanying the oral polio vaccine doses given to Karl, he had read previous package inserts accompanying the oral vaccine. Only after Karl developed polio did Dr. Lugg check the latest Lederle insert, which specifically provided in part:
 
 
 12
 Vaccinations should also be delayed in conditions having a suppressive effect on the immune-response mechanism, such as therapy with immune serum globulin, steroids, radiation, cancer chemotherapeutic agents, and in patients with leukemia, lymphogenous disease, and disgammaglobinemia--[4]
 
 
 13
 Dr. Lugg admitted during cross-examination that if he had read the latest Lederle insert before administering the vaccine to Karl, he would probably have made further inquiry concerning the vaccine's safety. However, he conceded that he did not make any inquiries with Lederle until after Karl contracted polio.
 
 
 14
 Dr. Lugg further testified that he placed great reliance on the "Red Book," a compilation of defendant American Academy of Pediatrics.[5] Dr. Lugg pointed out that the "Red Book" is considered to be a very authoritative source which is republished every three or four years by the Academy. Although Dr. Lugg did not state that he specifically consulted the 1970 Red Book before giving the oral polio vaccine to Karl, he seemed to rely on the fact that neither that edition of the "Red Book" nor other sources listed any specific immunity related contraindications for live oral polio vaccine.
 
 
 15
 In 1974, however, more than a year before Karl's first dose of vaccine, the Academy published the 1974 edition of the Red Book, which contained the following statement regarding live polio vaccine:
 
 
 16
 Patients with immune deficiency state such as thymic displasia or current immune suppression therapy should not receive TOPV (trivalent oral polio vaccine).
 
 
 17
 In another section the 1974 Red Book stated:
 
 
 18
 Recognition of cellular immunodeficiencies is important because these patients must not receive BCG or live virus vaccines (because of the risk of overwhelming infection)....
 
 
 19
 Dr. Lugg admitted that he never consulted the 1974 Red Book but that if he had read these warnings, he would have made further inquiries before giving Karl the vaccine.
 
 
 20
 After hearing plaintiffs' proof, the district judge found that even if it were assumed that there was a duty owed by each defendant to the plaintiffs and that each defendant breached its duty, the evidence presented would not support a finding that there was a proximate causal connection between the breaches of duty and the injuries sustained. The district judge had the benefit of appellate opinions of the Michigan courts which had considered the same issues and had pronounced the law of Michigan on this subject matter. See Dunn v. Lederle Laboratories, 121 Mich.App. 73, 328 N.W.2d 576 (1983); Formella v. Ciba-Geigy Corp., 100 Mich.App. 649, 300 N.W.2d 356 (1980).
 
 
 21
 We are inclined to go one step further and hold that even if we assume that each of the defendants owed a duty to these plaintiffs, there was no breach of that duty. As the testimony adduced during plaintiffs' proof demonstrated, the warnings given by Lederle in its current package inserts and by the Academy in its 1974 Red Book were adequate to put a reasonably competent pediatrician on notice regarding the danger associated with giving oral polio vaccine to a child suffering from an immunity deficiency. This view was specifically confirmed by plaintiffs' experts: Dr. Kenneth McIntosh, Dr. Martha Yow, and Dr. Jonas Salk. In sum, the defendants did not act in a negligent manner.
 
 
 22
 In addition to their attack on the substance of the district judge's directed verdict, plaintiffs have raised several evidentiary and procedural questions in support of their appeal. We have specifically considered each of plaintiffs' arguments and find them to be without merit.
 
 
 23
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Robert M. McRae, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 The original vaccine against polio was developed by Dr. Jonas Salk and first used in 1955. The Salk vaccine is an "inactivated" polio vaccine, i.e., a vaccine in which the virus has been killed by a chemical agent
 In 1962, Dr. Albert Sabin's oral polio vaccine came into use. The oral vaccine developed by Dr. Sabin and produced by Lederle Laboratories is a "live" vaccine i.e., one in which the virus is live but has been weakened through treatment with a chemical agent.
 
 
 [2]
 Agammaglobulinemia is an immune deficient state in which the patient has no (or very low) gamma globulins. An individual afflicted with this deficiency is very susceptible to infections and is essentially incapable of resisting all types of infectious agents--bacterial, viral, or fungal. There are in general two forms of agammaglobulinemia, an "x-linked" form which is congenital and a form known as "acquired" agammaglobulinemia. The "x-linked" form is the most common form and, in this form, is carried by females and passed to male offspring
 
 
 [3]
 Apparently, part of the theory of the plaintiffs case was that Lederle should have provided further warnings concerning the administration of oral polio vaccine through its detail men. Because we find Lederle's package insert warnings to have been adequate, we must reject the notion that Lederle had any further duty to warn physicians through its detail men
 
 
 [4]
 Dorland's Illustrated Medical Dictionary, 483 (25th ed. 1974), defines "dysgammaglobulinemia" as
 an immunological deficiency state characterized by selective deficiencies of one or more, but not all, classes of immunoglobulins, resulting in heightened susceptibility to infectious diseases vulnerable to immunoglobulin associated defense mechanisms. It may result from failure of synthesis of functional abnormality of immunoglobulins. The dysgammaglobulinemias have been classified into seven types (see table). Cf. agammaglobulinemia.
 
 
 [5]
 The title "Red Book" is the name which is used for the Report of the Committee on Infectious Diseases of the American Academy of Pediatrics