Monika FRALEY, Plaintiff,

v.

AMERICAN CYANAMID COMPANY
d/b/a Lederle Laboratories,
Defendant.

Civ. A. No. 81–K–2071.

United States District Court,
D. Colorado.

Aug. 25, 1983.

Robert P. Manning and C. Scott Crabtree, Cogswell & Wehrle, Denver, Colo., for plaintiff.

Robert W. Harris, Hall & Evans, Denver, Colo., for defendant.

## ORDER GRANTING SUMMARY JUDGMENT

KANE, District Judge.

In this products liability case plaintiff Monika Fraley seeks summary judgment on collateral estoppel grounds. Fraley contracted Type II poliomyelitis sometime in 1971, shortly after her daughter had been vaccinated with Orimune polio vaccine on July 13 and July 24, 1971. The vaccine was manufactured by Lederle Laboratories, a division of American Cyanamid Company. The parties have stipulated that Fraley contracted poliomyelitis as a result of contact with her child.

By this motion Fraley seeks collaterally to estop Lederle from litigating the issue of the adequacy of the warning it gave regarding the risk of use of Orimune polio vaccine. The basis for Fraley's motion is a jury determination in an earlier diversity case that the warnings Lederle provided in its package inserts and in the Physician's Desk Book were inadequate. *Givens v. Lederle Laboratories,* No. 73–59 Civ. T–K (M.D.Fla.1975), *app. decision* at 556 F.2d 1341 (5th Cir.1977).

The *Givens* plaintiff, a woman in her mid-twenties, contracted polio from an infant daughter who had recently received the Orimune vaccine. A jury returned a verdict of $250,000 in damages. In response to a special interrogatory, the *Givens* jury ruled that the warning regarding Orimune was inadequate. In response to Fraley's third request for admissions, Lederle has admitted that:

1. The *Givens* Orimune warning was identical to the Orimune warning in this case;

2. The adequacy of the Orimune warnings was actually litigated and essential to the final judgment in *Givens;* and

3. No court has ever entered a final judgment which included a finding that the Orimune warnings, either as a package insert or as a portion of the Physician's Desk Reference, was legally adequate.

From these admissions, Fraley argues that Lederle cannot relitigate the adequacy of the Orimune warnings in this case. She asserts that all the requirements of offensive issue preclusion have been met: a final judgment on the merits; an identicality of issues in the two actions; privity of defendants; and a full and fair opportunity to litigate. *Parklane Hosiery Co. Inc., v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Lederle disagrees. It argues that 28 U.S.C. § 1738, implementing the full faith and credit clause, requires me to treat the *Givens* decision as a Florida state court would, applying Florida law to determine the extent issue preclusion can be raised by one not a party to the earlier adjudication. Florida, in contrast to federal and Colorado law, has not abandoned the mutuality requirement of issue preclusion. *Mobil Oil Corp. v. Shevin,* 354 So.2d 372 (Fla.1978). Thus, Lederle contends it is free to relitigate the issue of the adequacy of the warnings accompanying the Orimune vaccine.

Lederle also claims that the issues are different here than in the *Givens* case, and, for a raft of reasons, that it would be unfair to permit the use of collateral estoppel in this case.

#### I.

At the outset, I note that there are three possible ways to decide the issue before me. First, I can apply Colorado law, as the law of the jurisdiction in which I sit. Second, I can apply Florida law in deference to the full faith and credit act. Third, I can apply federal law.

█ For the reasons annunciated below, I reject the first and second alternatives. I hold that where a federal diversity judgment is followed by a second action in diversity jurisdiction, it is incumbent upon the federal court to apply federal rules of res judicata and collateral estoppel.

This precise issue has not been addressed by the United States Supreme Court. On two occasions, it has recognized the problem. In *Heiser v. Woodruff* it said:

We need not consider whether, apart from the requirements of the full faith

and credit clause of the Constitution, the rule of res judicata applied in the federal courts, in diversity of citizenship cases, under the doctrine of *Erie* ... can be other than that of the state in which the federal court sits.

327 U.S. 726, 731–32, 66 S.Ct. 853, 855, 90 L.Ed. 970 (1974). Several years later, in *Blonder-Tongue, supra,* the court said:

Many federal courts, exercising both federal question and diversity jurisdiction, are in accord [on doing away with mutuality] unless in a diversity case bound to apply a conflicting state rule requiring mutuality. (Footnote omitted.)

402 U.S. 313, 325, 91 S.Ct. 1434, 1440, 28 L.Ed.2d 788 (1971). I do not understand this latter pronouncement to require me to apply Florida or Colorado issue preclusion law. "It is merely a factual observation—most federal courts have said that in diversity cases they are bound to apply the law of judgments of the state in which they sit." Degnan, *Federalized Res Judicata,* 85 Yale L.J. 741, 751 (1976). (Hereafter referred to as *Degnan.*) *See also,* Wright, Miller and Cooper, *Federal Practice and Procedure* § 4472, n. 25 (1981).

█ There is little disagreement that state law controls the effects of that state court's judgments in a later diversity action. *Eaton v. Weaver Mfg. Co.,* 582 F.2d 1250, 1256, n. 8 (10th Cir.1978); *McCarty v. Amoco Pipeline Co.,* 595 F.2d 389, 395–96 (7th Cir.1979); *Howard v. Green,* 555 F.2d 178, 181–82 (8th Cir.1977). This is true even where the first state's preclusion rules conflict with those of the diversity court's.[1] There is considerable disagreement whether this rule is required by *Erie* considerations,[2] or by the full faith and credit clause and its implementing statute.[3] It is equally clear

---

1. *But see Behrens v. Skelly,* 173 F.2d 715 (3rd Cir.), *cert. denied,* 338 U.S. 821, 70 S.Ct. 66, 94 L.Ed. 498 (1949); *Eisel v. Columbia Packing,* 181 F.Supp. 298 (D.Mass.1960). Both cases are discussed in *Degnan* at 752, 753.

2. The cases are collected in *Degnan* at 753, n. 49 and 19 A.L.R.Fed. 709 (1974). Typically, the analytical approach utilized seems to make little difference in the outcome. "The error in some of the cases here listed may be of the

harmless variety because they involved a state judgment called into question in a federal court of the same state. Whether it is *Erie* which controls or full faith and credit, the result would be the same." *Degnan* at 753, n. 49.

3. *Coppedge v. Clinton,* 72 F.2d 531, 536 (10th Cir.1934) (Pre-*Erie* ); *Hazen Research, Inc. v. Omega Minerals, Inc.,* 497 F.2d 151 (5th Cir. 1974); *Clyde v. Hodge,* 413 F.2d 48 (3d Cir.

that as between two federal courts exercising federal question jurisdiction, the scope of the judgment is also governed by federal law.[4]

The greatest confusion and source of disagreement is in cases like the one before me, where a federal diversity suit follows a federal diversity judgment. Some cases have relied upon *Erie* or the full faith and credit act to find that state law, whether of the forum court or the first court, controls. Others have specifically chosen not to decide the issue, or have chosen to apply state law without extended discussion. Still others have applied federal rules of preclusion. *See* Wright, Miller and Cooper, *Federal Practice and Procedure,* § 4472, nn. 26–28 (1981).

Worth noting is the District of Columbia Circuit's explanation in *Semler v. Psychiatric Institute of Washington, D.C.,* 575 F.2d 922 (D.C.Cir.1978).

> [W]e believe that the principles of *Erie R. Co. v. Tompkins* and the mandate of the Full Faith and Credit Clause as supplemented by 28 U.S.C. § 1738 require a federal court exercising diversity jurisdiction in Forum II to give to the judgment of a federal court exercising diversity jurisdiction in Forum I the same full faith and credit that a state court in Forum II would be obliged to give the judgment of a state court in Forum I, *at least* in the absence of an overriding federal interest. (Footnotes omitted, emphasis in original.)

575 F.2d at 927–28.

The court there found support for its position in an early Supreme Court case which gave preclusive effect to a Texas judgment in a later Louisiana suit, as determined by Texas law.[5]

In *United States v. United Air Lines, Inc.,* 216 F.Supp. 709, (D.Nev.E.D.Wash.

1962),[6] the district court was sitting as a court for both the district of Nevada and the eastern district of Washington. It initially tried some of the wrongful death claims in southern California under Nevada substantive law, the location of the air collision. A jury found United liable for the death of those plaintiffs. The remaining plaintiffs then moved for summary judgment as to liability. In addressing the mutuality question the court first looked to Nevada law and determined that Nevada had abandoned mutuality in 1916. The court then "advanced the more comforting authority of *Bernhard* [*v. Bank of America,* 19 Cal.2d 807, 122 P.2d 892 (1942)] which Nevada presumably would have followed in any event." *Degnan, supra,* at 764. Into this amalgam of California and Nevada law, Judge Hall also threw a collection of federal district and circuit cases abandoning the rule of mutuality in federal courts. 216 F.Supp. at 728.

In *Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532 (2d Cir. 1965), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966), the trial court, sitting in diversity in New York, ruled that the defendant was collaterally estopped from relitigating a question of liability for willful misconduct by virtue of an earlier diversity action in California. 346 F.2d at 538–39. On appeal, the district court's ruling was upheld. The Second Circuit first considered the issue "in light of the radiations of *Erie R.R. v. Tompkins* . . . ." 346 F.2d at 539. It then suggested that "[t]he collateral estoppel effect to be given to a prior *federal* court judgment in a subsequent action in either *federal or state court* might itself be a matter of federal law." *Id.,* at 540. (Emphasis in original.) Avoiding a difficult decision, it found instead that "whether the applicability of collateral estoppel is governed by federal, New York or

---

4. *Williamson v. Columbia Gas & Electric Corp.,* 186 F.2d 464 (3d Cir.), *cert. denied,* 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355 (1951). *Gambocz v. Yelencsics,* 468 F.2d 837 (3d Cir.1972).

5. *Magnolia Petroleum Co. v. Hunt,* 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 149 (1943).

6. *Affirmed sub nom. United Air Lines, Inc. v. Wiener,* 335 F.2d 379 (9th Cir.), *cert. denied,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964).

1969); *Wayside Transp. Co. v. Marcell's Motor Express, Inc.,* 284 F.2d 868 (1st Cir.1960).

California law, the result in this case would be the same.... " *Id.*, at 541.[7]

Among those diversity cases applying the first forum's *federal* collateral estoppel law is *Kern v. Hettinger,* 303 F.2d 333 (2d Cir. 1962). An earlier defamation case filed in the northern district of California was dismissed there under Rule 41(b), F.R.Civ.P. In the second New York diversity action, the court granted the defendant's motion for summary judgment on claim preclusion grounds. The plaintiff argued that California law determined the "character and extraterritorial effect of the judgment.... " 303 F.2d at 340. The Court of Appeals disagreed.

> One of the strongest policies a court can have is that of determining the scope of its own judgments. It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity. The rights and obligations of the parties are fixed by state law. These may be created, modified and enforced by the state acting through its own judicial establishment. But we think it would be strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights. The Erie doctrine is not applicable here.... (Citations omitted.)

303 F.2d at 340. *See also, La Societe Anonyme des Parfums Legalion v. Jean Patou, Inc.,* 495 F.2d 1265, 1275 (2nd Cir.1974); *Glick v. Ballentine Produce, Inc.,* 343 F.2d 839, 840–41 (8th Cir.) *cert. denied,* 382 U.S. 891, 86 S.Ct. 184, 15 L.Ed.2d 149 (1965).

Additional authority for the principle suggested by *Kern* is *Aerojet-General Corp. v. Askew,* 511 F.2d 710 (5th Cir.1975). A first suit in federal diversity court was followed by a second suit in state court which Aerojet sought to enjoin in federal court. The party opposing the injunction argued that Florida law controlled the scope of the first diversity action. The Fifth Circuit disagreed.

> Federal law clearly governs the question whether a prior federal court judgment based on federal question jurisdiction is res judicata in a case also brought, as this one was, under federal question jurisdiction. We believe the same result obtains where, as in this case, the first suit was brought only under diversity jurisdiction. The federal doctrine of res judicata bars relitigating any part of the cause of action in question, including all claims and defenses that were actually raised or could have been raised. (Footnote omitted.) [8]

511 F.2d at 715.

Given the confusion in the case law, and in the absence of controlling case law in this circuit, I choose to follow the approach of *Kern v. Hettinger* and *Aerojet-General Corp. v. Askew* in looking to the first forum's rules of collateral estoppel to determine the scope and effect of the earlier judgment. In so doing, I am guided by the policies behind collateral estoppel and the "importance of preserving the integrity of federal court judgments.... " 511 F.2d at 716. These concerns were ably articulated by Judge Weinman under similar circumstances:

> The doctrine of res judicata or issue preclusion is founded upon the policy of terminating needless and endless litigation, avoiding inconsistent judicial decisions on the same set of facts and effectively allocating judicial time. These policy considerations are directly and intimately related to an overriding federal interest in the effective administration of justice in the federal court system. Furthermore, the issue of the preclusive effect of a federal

---

**7.** *See also, Provident Tradesmens Bank and Trust Co. v. Lumbermens Mutual Casualty Co.,* 411 F.2d 88 (3d Cir.1969).

**8.** *See Williams v. Ocean Transport Lines, Inc.,* 425 F.2d 1183 (3d Cir.1970), which reached the same conclusion through a "federal interests" analysis. 425 F.2d at 1189, 1190. The approach is criticized in *Degnan* as "unnecessarily complicated." 85 Yale L.J. at 766.

district court judgment upon an action filed in another district court directly bears upon the internal relationship between compartments of a single federal judicial system. In order to guarantee the effective functioning of the various federal district courts as components of a unitary system for the administration of justice, the force and effect of a judgment rendered in a federal district court upon an action pending in other federal district courts should properly be determined under federal law.

*In Re Air Crash Disaster, Dayton, Ohio on March 9, 1967,* 350 F.Supp. 757, 764 (S.D. Ohio 1972), *reversed on other grounds, sub nom. Humphreys v. Tann,* 487 F.2d 666 (6th Cir.1973).[9]

## II.

As I noted above, Lederle argues that even if federal law of collateral estoppel applies, the issues in the instant action are different than those in the Florida action. In *Givens,* the plaintiff took her daughter to her pediatrician on November 7, 1971. Nine days after the second administration of the polio vaccine, Sherry Givens developed polio. 556 F.2d at 1343.

On appeal Lederle argued, *inter alia,* that "the trial court should have granted a directed verdict in its favor because the warning was not inadequate and the failure to warn, if any, was not a proximate cause of Mrs. Givens' disease." *Id.* at 1345. Lederle admits that the warning in *Givens* is identical to the warning in this case. It argues that "the issue presented to the court in *Givens* was the adequacy of the warning *to the consumer,* . . . [while the issue to be determined here] . . . is the adequacy of the warning *to the medical profession* . . . ." *Defendant's Memorandum* at 26.

I disagree. As the Fifth Circuit noted in *Givens,* "[p]laintiffs' case hinges upon the warning." 556 F.2d at 1345. I understand

*Givens* to say that the adequacy of the warning to the consumer and the adequacy of the warning to the doctor were before it. The critical language in *Givens* is as follows:

> When a private doctor administers a drug by prescription . . . it is defective only if the manufacturer does not warn the doctor about any hazard known. There is solid evidence that the vaccine was administered here in a manner more like that at a small county health clinic . . . than by prescription.

> \*   \*   \*   \*   \*   \*

> If so, then Lederle is responsible for taking definite steps to get the warning directly to the consumer.

> Even if we were to assume the opposite, *i.e.,* that the administration here was really like that of a prescription drug, there was still enough evidence to sustain the jury verdict.

*Id.* at 1345. Lederle argues that this last sentence is *dictum* and that the adequacy of the warning to the *Givens'* doctor was not at issue. If anything is *dictum* in the opinion, it is the first two paragraphs pertaining to the warnings to the consumer. There is simply not a syllable of language to suggest that *Givens* was tried on any theory but an inadequate warning to the doctor. On appeal in *Givens,* Lederle argued that there was "'no evidence whatsoever' showing that *the warning given to the doctor did not adequately* state the risk." *Id.* at 1345 (emphasis added). The opinion goes on to detail the options open to Givens had she known about the risks involved. It then says: "*[t]he failure to impress upon the private physician* the real risk involved in using a live virus thus became a cause of Mrs. Givens' paralytic disease." *Id.* at 1346 (emphasis added). Accordingly, I am satisfied that the issue decided in *Givens* is identical to the issue before me in this action.

9. *Compare:*

If state courts could eradicate the force and effect of federal court judgments through supervening interpretations of the state law of

res judicata, federal courts would not be a reliable forum for final adjudications of a diversity litigant's claims. 511 F.2d at 716 (Footnote omitted.)

### III.

Lederle next argues that the plaintiff has a greater burden in this case than the plaintiff had in *Givens*. Lederle correctly states the rule that collateral estoppel cannot be invoked when the burden of persuasion is heavier in the second action than in the first. It argues that § 13–21–403(3) *Colo. Rev.Stat.* (Supp.1982) creates such a burden.[10] Section 13–21–403(3) establishes a place of repose for manufacturers ten years after the product was first sold for use or consumption. It is not unique. Kentucky and Kansas have similar provisions. *Ky. Rev.Stat.* (1982) § 411.310(1); *Kan.Stat. Ann.* (Supp.1982) § 60–3303(b)(1).

Colorado's statute is similar in intent, if not in language, to § 110(B) of the Model Uniform Products Liability Act, 44 Fed. Reg. 62714 (October 31, 1979), also reproduced in 2A Frumer and Friedman, *Products Liability,* § 16D (1960, 1982). Section 110(B)(1), in pertinent part, provides:

> In claims that involve harm caused more than ten (10) years after time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence.

44 Fed.Reg. at 62732. Section 110's general purpose is "to provide insurers and products sellers with some security against stale claims, while preserving the claimant's rights to obtain damages for injuries caused by defective products." 44 Fed.Reg. at 62733. Section 110(B)

> recognizes consumer concerns in three basic ways:
>
> 1. The term of the statute is ten years—beyond the term enacted or proposed in a number of states;
>
> 2. The statute begins to run at the time of delivery, not the time of manufacture; and
>
> 3. The statute does not contain an absolute cutoff, but rather a presumption that the product has been used beyond its

useful safe life. *Colorado law utilizes this approach.* (Emphasis added.)

*Id.* at 62734. Were I applying § 110(B)(1) in this case, the rebuttable presumption would not be applicable, since the harm caused here, polio, happened within ten years of the date of the delivery of the vaccine.

■ There is no controlling precedent in Colorado interpreting § 13–21–403(3). Nor am I able to find any case law interpreting similar statutes in Kansas or Kentucky. There are obvious differences between Colorado's statute of repose and § 110(B) of the Model Act: Colorado's version runs from the date of manufacture, not from the date of delivery. Still, I see no reason not to construe § 13–21–403(3) in light of the Model Act. I therefore hold that the statute means an injury complained of must have occurred within ten years of the date the product was first sold for use or consumption. The vaccine in question here was first sold in 1963. Fraley contracted polio in 1971. The statute's rebuttable presumption is therefore not applicable to this case, and is not a barrier to the application of collateral estoppel.

### IV.

■ Under some circumstances, the application of collateral estoppel is unfair to a defendant. One such circumstance arises when the earlier judgment is inconsistent with other judgments in favor of the defendant. "Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979); *Restatement (Second) Judgments,* § 29 (1982).

The inconsistent judgment Lederle relies upon is *Dunn v. Lederle Laboratories,* 328 N.W.2d 576 (Mich.App.1982), where the

---

**10.** Section 13–21–403(3) provides:

Ten years after a product is first sold for use and consumption, it shall be rebuttably presumed that the product was not defective and that the manufacturer or seller thereof was not negligent and that all warnings and instructions were proper and adequate.

plaintiff contracted polio after her infant child was administered polio vaccine. A jury verdict was affirmed on appeal, in part, on the basis that even if Lederle's warnings were inadequate, any failure to warn was not the proximate cause of the plaintiff's injuries. 328 N.W.2d at 580.

As far as I am concerned there was a jury verdict in Lederle's favor, but not on the adequacy of the vaccine warning. As such, this situation is distinguishable from *Tretter v. Johns-Manville Corp.,* 88 F.R.D. 329, 333 (E.D.Mo.1980), where all of the earlier judgments relied upon by the parties were limited to a finding that asbestos was unreasonably dangerous.

*Dunn* is also not inconsistent with *Givens* because the warnings at issue there were materially different than those presented in the Florida action. The *Givens* warning was as follows:

> Fortunately, such occurrences are rare, and it could not be definitely established that any such case was due to the vaccine strain and was not coincidental with infection due to naturally-occurring poliomyelitis or other enteroviruses. This matter of 'vaccine-associated' illness is receiving careful attention and surveillance. Various authorities, on the basis of present information and careful analysis, estimate the risk if it exists to be no more than one case of 'vaccine-associated' paralytic disease for every 3,000,000 or more doses of live, oral, polio virus vaccine distributed.

In *Dunn,* the warning read:

> Fortunately, such occurrences are rare, but considering the epidemiological evidence developed with respect to the total group of 'vaccine-related' cases it is believed by some that at least some of the cases were caused by the vaccine.
>
> The estimated risk of vaccine-induced paralytic disease occurring in vaccinees of those in close contact with vaccinees is extremely low. A total of approximately 30 of such cases were reported for the six year period covering 1963 to 1970 during which time about 147,000,000 doses of the vaccine were distributed nationally.

Even though this risk is low it should always be a source of consideration.

The *Givens* warning suggests that any vaccine-associated illnesses may have been due to naturally occurring poliomyelitis. The *Dunn* warning does not. It acknowledges that the risk of contracting polio from a vaccine is low, but "should always be a source of consideration." The *Givens* warning suggests that there may be no risk from the vaccine—"if it exists." In my judgment, the differences are sufficient enough that the danger of inconsistent verdicts is nonexistent. The issues in *Dunn* were different than those in *Givens* or this case.

### V.

Lederle also raises two additional reasons why, in my discretion, I should deny the use of offensive issue preclusion. Neither has merit.

It first suggests that because Fraley had been vaccinated for Type III polio in 1965 while the *Givens* plaintiff had never been vaccinated, that Fraley would not be concerned with the risk of personally contracting polio from her daughter's vaccination. Hence, it argues that the warnings, at least as to Fraley, would be adequate.

This argument is factually incorrect, not supported by any affidavits, and legally incorrect. Fraley received a Type III polio vaccine while in Germany. She contracted Type II polio from her daughter. She apparently was also at risk for Type I. The warning in question makes no mention of these particular risks. Further, as the plaintiff points out, this is properly an issue relevant to proximate cause, not the adequacy of the warning.

Lederle also suggests that it would be unfair to permit collateral estoppel here because the *Givens* warning and the warning here was approved by the Division of Biological Standards at two different times. Such a review process ensures that any warnings are in compliance with 21 C.F.R. § 600 *et seq.* Lederle suggests that government approval somehow would lessen or negate its liability for an inadequate

warning. *See Dunn v. Lederle Laboratories,* 328 N.W.2d at 584.

I disagree. In the first place, the government review is limited to proper form and citation authority and does not purport to judge the substantive content of the warning. *See* Plaintiff's Exhibit A. Second, there is no difference in the *Givens* warning and the warning before me, notwithstanding the second review by the Division of Biological Standards. Whether Lederle utilized the biological seal of approval in *Givens,* it admits that it had a full and fair opportunity to litigate in that action.

IT IS HEREBY ORDERED that the plaintiff's motion for partial summary judgment is granted.