**Samuel Joesph TAFOYA,
Plaintiff–Appellee,**

v.

**SEARS ROEBUCK AND CO. and Roper
Corporation, Defendants–Appellants.**

No. 85–1818.

United States Court of Appeals,
Tenth Circuit.

Sept. 1, 1989.

---

Julia M. Duffy (Mary A. Wells with her on the brief) of Weller, Friedrich, Hickisch, Hazlitt & Ward, Denver, Colo., for defendants-appellants.

Stephen N. Berkowitz (Leigh M. Lutz, with him on the brief, of Lutz and Berkowitz, Denver, Colo., and Richard Kranzler, Wheat Ridge, Colo., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR and BALDOCK, Circuit Judges.

HOLLOWAY, Chief Judge.

Plaintiff Tafoya's left hand and wrist were seriously injured when his hand was caught in the rotating blades of a riding tractor/lawnmower which had turned over. The jury returned a verdict of $150,000.00 for Tafoya based on strict liability in tort, holding Tafoya 50% at fault, the manufacturer Roper Corporation (Roper) 30% at fault, and the seller Sears Roebuck and Company (Sears) 20% at fault, thus reducing Tafoya's award to $75,000. I.R. 58.

Roper and Sears appeal the adverse judgment entered after the trial court's denial of their motions for judgment n. o. v. and a new trial. We affirm.

# I

## Factual Background & Procedural Posture

Viewing the evidence in the light most favorable to Tafoya, who prevailed on the jury verdict, the record shows the following:

In 1979 Tafoya purchased a used tractor/lawnmower which had two previous owners. The mower was manufactured by Roper in 1968 and sold by Sears in 1969. Tafoya had just finished mowing weeds on his neighbor's property in June, 1983 when the riding tractor/lawnmower tipped over.[1] The weeds surrounded trees which were adjacent to a drop-off of approximately 30 feet. IV R. 162. The mower is 50 inches wide and the trees were 54 inches from the drop-off and were approximately six feet apart. VI R. 52-53, 55. Tafoya had returned to mow a patch of weeds which had been missed, just up the hill above the two trees. He made the cut and then drove between the trees toward the drop-off. Staying as close to the tree on the left as he could without scarring it, he began turning to the left, along the edge of the drop-off. As he turned, with the nose of the mower just past the tree on the left, the mower tipped, rolled over the drop-off, and lodged upside down in some chokecherry bushes, approximately six feet down from the edge. By this time, he had mowed the area by the drop-off at least 16 times. IV R. 90, 94, 101.

Tafoya testified that the mower tipped while still entirely on the edge of the property. He said that as the mower tipped to the right, he jumped off to the left toward the trees, and then slid down over the edge of the drop-off. IV R. 94, 95, 100.[2] Tafoya said that as he slid over the edge of the drop-off, he reached out to push off the mower's deck, but that his hand slipped off the rim of the deck and into the spinning blades. IV R. 100-102.[3] Tafoya's hand was severely injured. A physician testified there was "a near amputation" of his thumb, which was lacerated and fractured in several places. His wrist and ring finger were also fractured and several bones were exposed. II R. 41-42.

At the time Roper manufactured the mower in 1968 it conformed to all industry safety standards. VI R. 10-24. When Sears sold the mower in 1969, two separate manuals were provided to purchasers, setting forth instructions and warnings. Defendants' Exhs. G, H. Although Tafoya was aware of the manuals, he never asked the previous owners for them, nor did he request them from Sears. IV R. 154, 157.

There was conflicting testimony as to whether the mower conformed to the state of the art in 1968. Tafoya's expert Sevart testified that deadman devices were state of the art in 1968 and that the riding tractor/lawnmower could have feasibly been equipped with one. III R. 71[4] Roper's

---

1. The tractor/lawnmower which Tafoya owned is pictured in the Appendix to this opinion.

2. There is a conflict in the testimony regarding how and where the mower tipped. Mr. Clarke, the engineer who designed the mower for Roper and reconstructed the accident, testified that the minimum outside turning radius of the mower was six feet and that there was not enough space for the plaintiff to turn the mower around the tree without going over the edge of the drop-off. VI R. 56, 58. Viewing the evidence in Tafoya's favor, the jury was entitled to find that the mower tipped while still on the edge of the slope.

3. There is conflict in the testimony at this point as well. According to the records of Tafoya's physician, Tafoya was injured when the mower fell on top of him. II R. 74. While this is consistent with Mr. Clarke's testimony that Tafoya could not have turned around the tree without driving off the edge of the drop-off, the jury was entitled to credit Tafoya's version of the accident. See Brown v. McGraw-Edison Company, 736 F.2d 609, 615 (10th Cir.1984).

4. A "deadman" device is a mechanism which stops a mower's rotating blades in the absence of intentional conduct by the operator to keep the blades running. III R. 39. There was expert testimony that various types of deadman devices were available in 1968. These included devices which would "kill the engine any time the operator left the machine for any reason," devices which would kill the engine "if the oper-

expert testified that the mower conformed to the state of the art in 1968. VI R. 46–47.

Tafoya withdrew all but his strict liability claims before trial. The jury was instructed on the elements of strict liability and on the defenses of assumption of the risk and misuse. The jury was also instructed to consider Tafoya's fault. IX R. 18. The jury found Tafoya 50% at fault, Roper 30% at fault, and Sears 20% at fault.

Sears and Roper filed a motion for judgment n. o. v., or in the alternative, for a new trial. The trial court denied their motions in a brief order. I.R. 87. On appeal they argue that: (1) Sears cannot be held strictly liable because it is a seller and not a manufacturer; (2) Colorado's statutory rebuttable presumption of non-defectiveness must be rebutted by clear and convincing evidence and not a mere preponderance of the evidence, as the jury was instructed; (3) the crashworthiness or second collision doctrine does not apply to riding lawnmowers and that, assuming it does, the evidence was insufficient to show enhancement of Tafoya's injuries; (4) because an ordinary consumer would have appreciated the risk of harm (from the rotating blades), the lawnmower was not unreasonably dangerous; and (5) Tafoya voluntarily assumed the risk of injury.

## II

## Analysis

### A.

*Denial of the Motion for Judgment Notwithstanding the Verdict*

In reviewing the denial of a motion for judgment n. o. v., we employ the same standard as the trial court. *Brown v.*

*McGraw–Edison Company,* 736 F.2d 609, 613 (10th Cir.1984). "Judgment n.o.v. is proper only when the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka,* 814 F.2d 1412, 1418 (10th Cir.1987) (quoting *Delano v. Kitch,* 663 F.2d 990, 1002 (10th Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982)). We view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences from the evidence. *Trujillo v. Goodman,* 825 F.2d 1453, 1456 (10th Cir. 1987). We do not consider the credibility of witnesses, weigh the evidence, or substitute our judgment for that of the jury. *Brown,* 736 F.2d at 615. And if there is conflicting or insufficient evidence to warrant a one-way conclusion, judgment n. o. v. is inappropriate. *Ryder,* 814 F.2d at 1418. A judgment "notwithstanding the verdict should be cautiously and sparingly granted." *Bruno v. Western Electric Company,* 829 F.2d 957, 962 (10th Cir. 1987).

### i.

Sears' Strict Liability as a Seller Under Colo. Rev. Stat. § 13–21–402

■ It is undisputed that the riding tractor/lawnmower was manufactured by Roper and sold by Sears. The jury found Sears 20% at fault. Sears argues that as the seller it cannot be held strictly liable. Colorado statutes expressly limit strict product liability actions to manufacturers, unless jurisdiction cannot be obtained over a particular manufacturer, in which case that manufacturer's principal distributor or seller is deemed the manufacturer.[5]

ator left the machine with the blades running" and devices which would stop the machine "if a certain angle was exceeded." III R. 40.

5. Colorado Rev.Stat. § 13–21–402 (1987), identical to the statute in effect at the time of the injury, states:

**Strict liability.** (1) No product liability action based on the doctrine of strict liability in tort shall be commenced or maintained against any seller of a product which is alleged to contain or possess a defective condi-

tion unreasonably dangerous to the buyer, user, or consumer unless said seller is also the manufacturer of said product or the manufacturer of the part thereof claimed to be defective. Nothing in this part 4 shall be construed to limit any other action from being brought against any seller of a product.

(2) If jurisdiction cannot be obtained over a particular manufacturer of a product or a part of a product alleged to be defective, then that manufacturer's principal distributor or seller over whom jurisdiction can be obtained

Tafoya does not contend that Sears actually manufactured the riding lawnmower, but rather that Colo. Rev. Stat. § 13–21–401 deems certain sellers manufacturers.[6] Tafoya argues that Sears is a manufacturer within the meaning of § 13–21–401 because it owned Roper in whole or significant part and/or because it exercised some significant control over all or a part of Roper's manufacturing process.[7] If, viewed in the light most favorable to the plaintiff, *see Trujillo*, 825 F.2d at 1456, the evidence supports either of these contentions, then the jury was entitled to deem Sears a manufacturer for purposes of the statute.

Tafoya's expert witness, Mr. Kitzes, testified that since the mid–1960's, Sears had "a substantial stock ownership of Roper...." V R. 50. Kitzes was employed from 1974 through 1981 by the Consumer Product Safety Commission. V R. 20. He was employed to develop and publish a standard for power mowers, in order to prevent unreasonable risks of injury. In completing this assignment Kitzes obtained the Consumer Product Safety Commission file on power mowers and reviewed all the material that had been collected, dating from the mid–1950's through 1977. V R. 22. His review of these files revealed Sears' interest in Roper.

Viewed in the light most favorable to Tafoya, the evidence supported a finding that Sears owned Roper in whole or significant part. Sears does not point to any evidence which would tend to show that it did not own such an interest in Roper. While Sears argues that Kitzes' testimony does not sufficiently explain the phrase "substantial stock ownership," the admissibility of evidence is within the discretion of the trial court, *see United States v. Turner*, 799 F.2d 627, 630 (10th Cir.1986), and we do not weigh the evidence in reviewing a trial court's denial of a motion for judgment n.o.v. *Brown*, 736 F.2d at 615. Because there was competent evidence that Sears owned Roper in substantial part, the jury was entitled to deem that Sears was a manufacturer within the meaning of Colo. Rev. Stat. § 13–21–401(1).

Section 401(1) is phrased in the disjunctive so that Sears' partial ownership of Roper alone satisfied the requirement.

---

shall be deemed, for the purposes of this section, the manufacturer of the product.

6. Colorado Rev.Stat. § 13–21–401 (1987), identical to the statute in effect at the time of injury, provides in part:

**Definitions.** As used in this part 4, unless the context otherwise requires:

(1) "Manufacturer" means a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or consumer. The term includes any seller who has actual knowledge of a defect in a product or a seller of a product who creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product or who otherwise exercises some significant control over all or a portion of the manufacturing process or who alters or modifies a product in any significant manner after the product comes into his possession and before it is sold to the ultimate user or consumer. The term also includes any seller of a product who is owned in whole or significant part by the manufacturer or who owns, in whole or significant part, the manufacturer. A seller not otherwise a manufacturer shall not be deemed to be a manufacturer merely because he places or has placed a private label

on a product if he did not otherwise specify how the product shall be produced or control, in some significant manner, the manufacturing process of the product and the seller discloses who the actual manufacturer is.

. . . .

(3) "Seller" means any individual or entity, including a manufacturer, wholesaler, distributor, or retailer, who is engaged in the business of selling or leasing any product for resale, use, or consumption.

7. Pursuant to Colo.Rev.Stat. § 13–21–401(1), the court correctly instructed the jury in instruction 23 that:

The plaintiff alleged that the Defendant Sears should be held liable for his injuries, for casting into the stream of commerce a tractor/mower which was defectively designed and unreasonably dangerous.

The mower was manufactured by Roper Corporation, and offered for sale to the public by Sears. The law in this state says that a seller of the defectively designed product may be held liable for damages caused by that product if the seller has actual knowledge of a defect in the product. The seller may also be held liable if it owns, in whole or in significant part, the manufacturer.

*See* IX R. 14.

However, in addition Tafoya argued that Sears exercised significant control over the manufacturing process and we note that there was evidence upon which the jury could reach that conclusion.[8] Thus, the finding of liability as to Sears was not error.

### ii.

### The Rebuttable Presumption of Non–Defectiveness

■ Colorado Revised Statute 13–21–403(1)(a) & (3) creates a rebuttable presumption that any product that conformed to the state of the art prior to its sale, or caused injury ten years after it was sold for use or consumption, is not defective.[9] There is no dispute that the lawnmower in this case was first sold to the public more than ten years prior to Tafoya's injury on June 12, 1983, *see Patterson v. Magna American Corp.*, 754 P.2d 1385, 1387 (Colo.App.1988) (the statutory language refers to the time when a product line of a particular design was first sold), and that the presumption applies.[10] The dispute here is whether the presumption has to be rebutted by a preponderance of the evidence, as the trial court instructed the jury,[11] or by clear and convincing evidence, as the defendants argue.

We think it clear that the trial court, applying Colorado law, correctly instructed the jury that the presumption of non-defectiveness contained in Colo. Rev. Stat.

---

**8.** Mr. Clarke testified that Sears had input in the design of the riding tractor/mower, the extent of testing, and merchandising. VI R. 68–69. He said that Sears visited the test sites and did test work on products which were being designed. VI R. 147. Clarke testified that if Sears had asked he would have incorporated a deadman device in the riding tractor/lawnmower. VI R. 96. This evidence is sufficient for the jury to conclude that Sears had significant control over a portion of the manufacturing process, within the meaning of Colo.Rev.Stat. § 13–21–401(1).

**9.** Colo.Rev.Stat. § 13–21–403(1)(a) & (3) (1987), identical to the statute in effect at the time of the injury, provides in part:

> **Presumptions.** (1) In any product liability action, it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product:
>
> (a) Prior to sale by the manufacturer, conformed to the state of the art, as distinguished from industry standards, applicable to such product in existence at the time of sale; or
> . . . .
> (3) Ten years after a product is first sold for use or consumption, it shall be rebuttably presumed that the product was not defective and that the manufacturer or seller thereof was not negligent and that all warnings and instructions were proper and adequate.

**10.** There is some dispute about whether the lawnmower conformed to the state of the art, but that dispute is immaterial since it is undisputed that the injury occurred more than ten years after the mower was sold for use. Under Colo.Rev.Stat. § 13–21–403, this alone is sufficient to invoke the presumption.

**11.** The trial court gave two instructions which explain the presumption and the burden of proof. Instruction 22 stated in part:

> Presumptions are rules based on experience or public policy and are established in the law to assist the jury in ascertaining the truth.
> . . . .
> In this case, if you find that, one, prior to the manufacture by Roper or the sale by Sears, the tractor/mower conformed to the state of the art, as distinguished from industry standards, and, two, such state of the art was applicable to such products as the tractor/mower at the time of such sale, then the law presumes the tractor/mower was not defective.
> You must consider this presumption together with all the other evidence in the case in determining whether or not the tractor/mower was defective. This presumption may be rebutted by a preponderance of the evidence to the contrary.

IX R. 13–14. Instruction number 29 stated:

> 29. As I have instructed you, presumptions are rules based on experience or public policy and are established in the law to assist the jury in ascertaining the truth.
> In this case, if you find the tractor/mower was sold for the first time for use or consumption ten or more years before any claimed injuries were incurred by the Plaintiff, then the law presumes that the tractor/mower was not defective and that all warnings and instructions were proper and adequate.
> You must consider this presumption together with all the other evidence in the case in determining whether or not the tractor/mower was defective, and all warnings and instructions were proper and adequate. This presumption may be rebutted by a preponderance of the evidence to the contrary.

IX R. 16–17.

§ 13–21–403 could be rebutted by a preponderance of the evidence to the contrary. In *Union Ins. Co. v. RCA Corp.*, 724 P.2d 80, 83 (Colo.App.1986), the court held that:

[T]he presumptions established by § 13–21–403 are considered to be evidence of non-defectiveness of a product. *See Belle Bonfils Memorial Blood Bank v. Hansen, supra* [665 P.2d 118 (Colo. 1983)]; *Hawkinson V. A.H. Robins Co., Inc.*, 595 F.Supp. 1290 (D.Colo.1984). Thus, while *the instruction did not alter the plaintiff's burden of persuasion regarding the defective condition of the TV*, it did affect that burden by supplementing defendant's burden of going forward.

*Id.* at 83 (emphasis added). While noting that the instruction regarding a presumption of non-defectiveness did not alter the plaintiff's burden of persuasion, the court thus implicitly recognized that the presumption could be rebutted by a preponderance of the evidence.

In *Hawkinson v. A.H. Robins Co., Inc.*, 595 F.Supp. 1290 (D.Colo.1984), cited approvingly in *Union Ins.*, the court applied the preponderance of the evidence standard when it held that "plaintiffs have introduced sufficient evidence to rebut the presumption [of non-defectiveness contained in § 13–21–403] and the evidence is sufficient to *outweigh the evidence of no defect, including the presumption.*" *Id.* at 1311 (emphasis added). *Union Ins. Corp.* and *Hawkinson* clearly support the trial court's instructions in this case. We note also that the instructions were in accord with CJI–Civ.2d 14:24–14:26 (1980),[12] which provides that "[u]nless and until the presumption is outweighed by evidence to the contrary which has been proved by a preponderance of the evidence, you must consider the presumption with the other evidence in arriving at your verdict."

The defendants cite *Fraley v. American Cyanamid Company*, 570 F.Supp. 497 (D.Colo.1983), in support of their argument that the plaintiff must produce clear and convincing evidence to rebut the presumption of non-defectiveness. In *Fraley*, it was argued that the plaintiff had a greater burden of proof than had been carried in a prior action; that therefore collateral estoppel should not apply from that prior suit. The district judge in *Fraley* did agree that § 13–21–403(3) would impose a heavier burden, although he held that this Colorado statute and its presumptions did not apply because the harm in question occurred within 10 years from delivery of the product.

The reasoning by the judge in *Fraley* that a heavier burden of persuasion is imposed by § 13–21–403(3) is not persuasive to us. It was based on § 110(B)(1) of the Model Uniform Products Liability Act and its express provision that the presumption of non-defectiveness "may only be rebutted by clear and convincing evidence." The judge in *Fraley* looked to that language. We are not convinced that § 13–21–403(3), which has no such provision, would likewise impose the heavier "clear and convincing" burden of proof. The other cases discussed are more persuasive to us.

 The defendants correctly note that the status and strength of a rebuttable presumption vary according to the force of the policies which motivate a court or a legislature to create it and that there are therefore no universal rules as to the amount of evidence necessary to overcome a rebuttable presumption. *Cline v. City of Boulder*, 35 Colo.App. 349, 532 P.2d 770, 772 (1975). We are not persuaded that the

---

**12.** The trial court correctly looked to the Colorado Jury Instructions. "In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law." Fed.R.Evid. 302. In Colorado, when "instructing the jury in a civil case, the court *shall use* such instructions as are contained in Colorado Jury Instructions (CJI) as are applicable to the evidence and the prevailing law." Colorado Rules of Civil Procedure 51.1(1) (emphasis added). While the amendments to CJI–Civ.2d 14:24–14:26 (1980) do not provide that the presumption may be rebutted by a preponderance of the evidence, there is nothing to suggest, either in the supplemental instructions or in the case law, that the 1980 Colorado Jury Instructions do not correctly state prevailing law.

clear and convincing standard, specifically set out in 110(B)(1) of the Model Uniform Products Liability Act, should be grafted onto § 13–21–403. Rebuttable presumptions in the civil law are normally overcome by a preponderance of the evidence. *See Rivera v. Minnich*, 483 U.S. 574, 107 S.Ct. 3001, 3003 n. 5, 97 L.Ed.2d 473 (1987); *McCormick on Evidence*, § 344 (3d ed. 1984).[13] If the General Assembly had wished to depart from the normal standard it could have done so by including specific language like that of section 110(B)(1) of the Model Act. Moreover, we do not agree with the defendants' argument that allowing the presumption to be rebutted by a preponderance of the evidence will obliterate the effect of the presumption. The presumption is still part of the case. *See Union Insurance Corp.*, 724 P.2d at 83.

The trial court properly instructed the jury that the presumption could be rebutted by a preponderance of the evidence that the lawnmower was defective.

### iii.

### Recovery Under The Crashworthiness or Enhanced Injury Doctrine

■ In *Roberts v. May*, 41 Colo.App. 82, 583 P.2d 305 (1978), the Colorado Court of Appeals recognized the "crashworthiness" or "second collision" doctrine. Under this doctrine, a manufacturer may be liable in negligence or strict liability for injuries

sustained in an accident where a manufacturing or design defect, though not the cause of the accident, caused or enhanced the injuries. 2 L. Frumer & M. Friedman, *Products Liability* § 3.03[4][f][v] (1987).[14] The doctrine was first recognized in *Larsen v. General Motors Corp.*, 391 F.2d 495, 501–503 (8th Cir.1968), and is based upon the premise that some products, while they are not made for the purpose of undergoing impact, should be reasonably designed to minimize the injury-producing effect of impact.

In *Camacho v. Honda Motor Co., LTD.*, 741 P.2d 1240, 1243 (Colo.1987) (en banc), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988), the Colorado Supreme Court held that the doctrine applied to motorcycles as well as automobiles. The court reasoned that there was no "principled basis to conclude that liability for failure to provide reasonable, cost-acceptable safety features to reduce the severity of injuries suffered in inevitable accidents should be imposed upon automobile manufacturers but not upon motorcycle manufacturers" and noted that "motorcycle accidents are just as foreseeable as automobile accidents and that motorcycle riders face a much greater risk of injury in the event of an accident than do occupants of automobiles." *Id.* at 1243.

The record and appellate briefs show that the plaintiff's primary argument was

---

**13.** The most widely followed theory of presumptions is the "bursting bubble" theory. *McCormick*, § 344. Under this theory presumptions are "like bats of the law flitting in the twilight, but disappearing in the sunshine of actual facts." *Id.* If evidence to the contrary is produced the presumption disappears. McCormick notes that in some cases social policy requires departure from the normal preponderance standard. For example, a presumption of legitimacy is created when a child is born to a woman during a time when she is married. It is universally agreed upon that this presumption can only be rebutted by clear and convincing evidence. *See* McCormick, § 343, p. 972. The reason: social policy, to avoid the visitation upon the child of the sins of the parents and the social stigma of bastardy. *Id. See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (the Constitution requires clear and convincing evidence before the state may terminate the parental relationship). Here

there is no indication that the legislature, in creating § 13–21–403, intended to depart from the normal preponderance standard.

**14.** The doctrine has been adopted in the vast majority of jurisdictions which have considered the issue. *See* 1 R. Goodman, *Automobile Design Liability* § 1:4 (2d ed. 1983). One commentator has persuasively argued that the proper terminology for characterizing this doctrine is "enhanced injury," as opposed to crashworthiness or second collision. *See* Harris, *Enhanced Injury Theory: An Analytical Framework*, 62 N.C.L.Rev. 643, 647 (1984) (hereafter Harris). The terms "crashworthiness" and "second collision" are the products of automobile litigation. While the phrase enhanced injury may be the most accurate conceptually, *see* Harris at 648–649, we will use the terms crashworthiness and second collision, as those are the terms which the Colorado courts have used, as well as enhanced injury.

that the riding tractor/lawnmower was defectively designed because it lacked a deadman device and that while this did not cause the accident, it contributed to Tafoya's injuries.[15] Colorado has not addressed the question whether the crashworthiness or second collision doctrine applies to tractors or riding lawnmowers. One court has applied the doctrine to riding lawnmowers on a negligent design claim. *Harrison v. McDonough Power Equipment, Inc.,* 381 F.Supp. 926 (S.D.Fla.1974) (applying Florida law).[16] Other jurisdictions have concluded that it applies to tractors, *see Roe v. Deere and Co., Inc.,* 855 F.2d 151, 153 (3rd Cir.1988) (applying the doctrine to an agricultural tractor under Pennsylvania law); *Wagner v. International Harvester Co.,* 611 F.2d 224, 230 (8th Cir.1979) (applying doctrine, under Minnesota law, to a small Model 500C crawler tractor), and we do not see a principled basis under Colorado law for concluding that it does not apply to riding tractor/lawnmowers.

While the crashworthiness or enhanced injury doctrine has been applied primarily to automobiles, motorcycles, and airplanes, *see* Annotation, *Liability of Manufacturer, Seller, or Distributor of Motor Vehicle For Defect Which Merely Enhances Injury From Accident Otherwise Caused,* 42 A.L.R.3d 560 (1972), and cases cited therein, it has also been applied to snowmobiles, front-end loaders, pleasure boats,[17] and as noted earlier, riding lawnmowers and tractors. Colorado courts have noted that the doctrine is based upon the "pragmatic observation that collisions and accidents are natural, foreseeable consequenses of automobile use...." *May,* 583 P.2d at 307. *See also Camacho,* 741 P.2d at 1243 (motorcycle accidents are just as foreseeable as automobile accidents). While the foreseeability of an accident is not to be equated with duty, it is important in determining a manufacturer's responsibility, along with considerations of fairness. *Dreisonstok v. Volkswagenwerk, A.G.,* 489 F.2d 1066, 1070 n. 9 (4th Cir.1974). *See also Harris,* at pp. 652–657.

The record in this case is replete with evidence of injuries resulting from contact with the rotating blades of riding lawnmowers that have tipped over. *See* III R. 35–37, 82; V R. 27–29; VIII R. 4. The risk of severe injury from rotating lawnmower blades is obviously great. We are unconvinced by the notion that riding lawnmowers, unlike automobiles and motorcycles, are not designed for transportation so that the doctrine should not be applied in this context.[18] The courts in *Pennsylvania Glass* (front-end loader), *Brutus Corp* (loader manufacturer), *Roe* (agricultural tractor), *Wagner* (crawler tractor) and *Harrison* (riding lawnmowers) applied the doc-

---

**15.** The jury was instructed that there were three alleged defects: the lack of a deadman device, the failure to warn regarding the lawnmower's instability on a slope, and the insufficient space between the seat and the body of the mower, which made it difficult to exit in the event of an emergency. IX R. 3.

**16.** We are mindful that the judge and jury rejected the strict liability claim. *Harrison,* 381 F.Supp. at 928. Nevertheless, the application of the enhancement of injury theory, giving relief on the negligent design claim, is persuasive here.

**17.** *See e.g., Smith v. Ariens Co.,* 375 Mass. 620, 377 N.E.2d 954 (1978) (it is foreseeable that snowmobiles will be involved in collisions and there is a duty to design in such a way as to prevent enhanced injury); *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165 (3rd Cir.1981) (front-end loader was defective in failing to provide fire extinguisher, the absence of which enhanced plaintiff's injuries);

*Rubin v. Brutus Corporation,* 487 So.2d 360 (Fla. App.1986) (manufacturer had duty under crashworthiness doctrine to design boat to prevent enhanced injury to passengers), *review denied,* 500 So.2d 543 (Fla.1986).

**18.** In crashworthiness cases involving automobiles Colorado courts have emphasized the fact that automobiles are intended for use on roadways and that injury-producing collisions are a frequent and foreseeable result of normal use. *See, e.g., May,* 583 P.2d at 307–308. And in *Camacho* the court recognized that the use of "motorcycles for transportation over roadways is just as foreseeable as the use of automobiles for such [a] purpose." *Camacho,* 741 P.2d at 1243. But we do not think that this language was intended to limit the application of the crashworthiness doctrine to products which were designed exclusively for transportation. The cases involving pleasure boats, front-end loaders, snowmobiles, riding lawnmowers, and tractors demonstrate this.

trine despite the lack of transportation. We do not think that the element of transportation is essential for the doctrine to apply. In determining the scope of the enhanced injury doctrine, the Colorado Supreme Court identified the broad "goal of encouraging maximum development of reasonable, cost-efficient safety features." *See Camacho*, 741 P.2d at 1243. There is evidence in our record that accidents resulting from riding tractor/lawnmowers that have tipped over are foreseeable and we agree with the trial judge that riding tractor/lawnmower manufacturers cannot rationally or fairly be exempted from the protective policy of the doctrine.

 Having concluded that the crashworthiness or enhanced injury doctrine applies here, we must now consider whether there was sufficient evidence of enhancement of the plaintiff's injuries. As a part of a crashworthiness case, a plaintiff must show that his injuries were enhanced by the defect, in this case the absence of a deadman device. *Curtis v. General Motors*, 649 F.2d 808, 812–13 (10th Cir.1981) (applying Colorado law); *Larsen*, 391 F.2d at 501–502. The defendants argue that expert testimony is essential to establish enhancement of injuries. We disagree. While in some cases expert testimony may be necessary, *see Curtis*, 649 F.2d at 812–813 (cause of plaintiff's back injury unknown to expert witness and insufficient non-expert witness testimony was presented to establish cause), it is not critical when the circumstances involve obvious physical dangers within the understanding of ordinary observers and lay jurors.

Viewing this record in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, *see Trujillo*, 825 F.2d at 1456, we hold that there was sufficient evidence to establish enhancement of the plaintiff's injuries due to the lack of the deadman device. Doctor Betson testified that the plaintiff suffered a near amputation of his thumb, with lacerations extending from the top of his hand around the base of his thumb and into the palm of his hand and open fractures. II R. 41. He further testified that there were five or six fractures, *see* II R. 42, and multiple splinters. II R. 46. These injuries, he said, were consistent with the plaintiff's testimony (*see* IV R. 103, 108) that his hand was caught in the rotating blades of the lawnmower. II R. 76. Sevart also testified that the injuries suffered were caused by contact with the rotating blades. III R. 48. Viewed in the light most favorable to the plaintiff, there was sufficient evidence of enhancement of the plaintiff's injuries.[19]

iv.

The Unreasonably Dangerous Condition of the Lawnmower

 In Colorado, a manufacturer may not be held strictly liable unless a product is both defective and unreasonably dangerous. *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978) (en banc). The defendants argue that the lawnmower was not unreasonably dangerous because the risk of harm from the rotating blades was one which would have been fully anticipated by the ordinary consumer.[20] They rely

---

19. The defendants argue that the plaintiff's injuries could just as easily have been caused by his fall down the hill as by the lawnmower's blades and that there was insufficient evidence for the jury to find enhancement of his injuries. They note that the lawnmower's seat was torn up during the accident and that the plaintiff's hand could similarly have been injured. There was clearly sufficient evidence, however, for the jury to reach the enhancement of injuries conclusion. At best, this argument points to conflicting evidence and conflicting evidence on an issue compels the denial of a motion for judgment notwithstanding the verdict. *Ryder*, 814 F.2d at 1418.

20. The defendants' argument that the lawnmower was not unreasonably dangerous is directed to both the design defect and failure to warn claims. They argue that designing the lawnmower without a deadman device does not render it unreasonably dangerous since the danger of the blades would have been within the contemplation of the ordinary consumer. They also argue that since the specific harm was fully apparent and would have been anticipated, no warning was required. For purposes of our analysis, it does not matter that the argument is made in both contexts. Colorado recognizes that products may be defective due to manufacturing defects, design defects, or for failure to warn. *Camacho v. Honda Motor Co., LTD.*, 741

heavily upon the Colorado Court of Appeals decision in *Camacho v. Honda Motor Co., LTD.*, 701 P.2d 628 (Colo.App.1985), *rev'd*, 741 P.2d 1240 (1987). The Court of Appeals' decision was reversed after this appeal was briefed and argued. The Colorado Supreme Court's reversal undercuts the defendants' argument.

In *Camacho*, the plaintiff claimed that a motorcycle was defectively designed because it was not equipped with "crash bars" or other devices to protect the driver's legs in the event of a collision. *Camacho*, 741 P.2d at 1242. In determining whether the motorcycle was unreasonably dangerous, the Court of Appeals adopted the consumer expectations test contained in comment i to the RESTATEMENT (SECOND) OF TORTS § 402A (1965).[21] The court reasoned that the jury could not have reasonably determined that the risk of harm (injury to one's legs during a crash) would not have been fully anticipated by the ordinary consumer, 701 P.2d at 631, and held the defendants were entitled to summary judgment.

In reversing, the Colorado Supreme Court rejected the comment i consumer expectations test as a method of determining whether a product is unreasonably dangerous. *Camacho*, 741 P.2d at 1245. The

court noted that the consumer expectations test is "substantially similar to the open and obvious standard specifically rejected in *Pust.*" *Id.* at 1245. The primary focus of a products liability action must remain on the product and not the conduct of the hypothetical ordinary consumer, the court held, if the concept of enterprise liability for casting defective products into the stream of commerce is to have any effect. *Id.* at 1246. The court focused on whether the degree of inherent dangerousness could or should have been reduced and found "some evidence" in the record that Honda could have provided crash bars without impairing the motorcycle's utility or altering its nature. *Id.* at 1248–1249.

Citing *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410, 414 (Colo.1986), the Colorado Court reasoned that whether a product design is unreasonably dangerous is a determination which requires the balancing of a number of factors.[22] *Camacho*, 741 P.2d at 1247. Considering these factors, we hold there is sufficient evidence to support the inference that the mower was unreasonably dangerous. There was evidence, for example, of blade injuries resulting from tip-over accidents, *see* III R. 35–37, 82; V R. 28–29, and that a deadman device might have prevented Tafoya's inju-

---

P.2d 1240, 1247 (Colo.1987), *cert. dismissed*, — U.S. —, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988).

**21.** The Colorado Supreme Court adopted the doctrine of strict liability as set forth in the RESTATEMENT (SECOND) OF TORTS § 402A (1965). *Camacho*, 741 P.2d at 1244. Comment i provides that:

The rule applied in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer.

. . . .

The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

**22.** Those factors include:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Camacho*, 741 P.2d at 1247–1248 (citing *Ortho*, 722 P.2d at 414) (relying on Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837–838 (1973)).

ries and could feasibly have been installed. Thus, there is ample evidence supporting the jury's verdict.

v.

### Voluntary Assumption of a Known Risk

 The defendants argue that Tafoya voluntarily assumed the risk of injury. "In strict liability cases, assumption of the risk is defined as: 'voluntarily and unreasonably proceeding to encounter a known danger....'" *Jackson v. Harsco Crop.*, 673 P.2d 363, 366 (Colo.1983) (en banc) (quoting comment n, RESTATEMENT (SECOND) OF TORTS, § 402A (1965)).[23] The defendant must demonstrate that the plaintiff had actual knowledge of the specific danger posed by the defect and not just general knowledge that the product could be dangerous. *Id.* at 366 (citing *Culp v. Rexnord & Booth–Rouse Equipment Co.*, 38 Colo.App. 1, 553 P.2d 844 (1976)). Voluntary assumption of a known risk is distinguishable from ordinary contributory negligence, which consists of a failure to exercise due care to discover a defect or to guard against its existence. *Jackson*, 673 P.2d at 366. The burden of establishing the elements of voluntary assumption of a known risk is upon the party asserting it. *Pust*, 583 P.2d at 284.

The trial court instructed the jury that voluntary assumption of a known risk is an affirmative defense which, if established, would preclude the plaintiff's recovery.[24] The jury, applying the comparative negli-

gence instruction, reduced the plaintiff's award by 50% and did not, therefore, find that the plaintiff had voluntarily assumed the risk of injury.[25] Viewing the evidence in the light most favorable to Tafoya, *see Trujillo*, 825 F.2d at 1456, we agree with the trial court that there is evidence to support the jury's conclusion that Tafoya did not voluntarily assume the risk of injury.

There was evidence that Tafoya was aware that the lawnmower's blades would continue to turn unless disengaged, *see* IV R. 159, that he had an opportunity to disengage the blades after cutting the weeds, but chose not to, *see* IV R. 168, and that he knew that there were feasible alternatives to the tractor mower he selected. IV R. 152. But the defendants were required to demonstrate that Tafoya had actual knowledge of the specific danger. *Pust*, 583 P.2d at 284. The specific dangers were not only that the lawnmower's blades would keep turning unless disengaged, but also that the lawnmower would tip on the slope. A general awareness that one's body might become caught in the moving parts of machinery and suffer injury is not sufficient. *Id.* at 284 n. 8. *See also Culp*, 553 P.2d at 844. Here, there was some evidence that Tafoya was negligent, and indeed, the jury found him 50% at fault. But we cannot say that the evidence warrants only the conclusion that Tafoya had actual knowledge of the specific danger. *Ryder*, 814 F.2d at 1418. The jury was entitled to find that

**23.** Comment n provides that:

Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists of voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

**24.** Instruction 21 stated that:

The voluntary and unreasonable use of a defective product with knowledge of the spe-

cific danger created by a defect is an affirmative defense.

The Defendants, Sears Roebuck and Company and Roper, are not legally responsible to the Plaintiff, Mr. Tafoya, on the Plaintiff's claim of damages for sale of a defective product if this affirmative defense is proved. This affirmative defense is proved if you find all of the following: First, at the time the Plaintiff was injured, he had actual knowledge of the specific danger created by the defect which he claims caused his injury.

Two, the Plaintiff, while having such knowledge, voluntarily and unreasonably exposed himself to the risk of injury, and, three, the Plaintiff's use of the product was a cause of the Plaintiff's claimed injuries.

**25.** There was no challenge to the comparative fault instructions.

the plaintiff had not voluntarily assumed the risk of injury. The trial court correctly denied the defendants' motion for judgment notwithstanding the verdict.

### B.

### *Denial of the Motion for a New Trial*

In challenging the denial of their motion for a new trial, the defendants assert the same arguments which they make in support of their challenge to the trial court's denial of their motion for judgment n.o.v. We have upheld the trial court's legal determinations. The questions of whether Sears is a manufacturer under Colorado strict liability statutes, whether the presumption of non-defectiveness was rebutted, whether there was sufficient evidence of enhancement of the plaintiff's injuries to support recovery under the crashworthiness doctrine, whether the lawnmower was unreasonably dangerous, and whether the plaintiff voluntarily assumed the risk of injury, are all questions about the weight of the evidence.

"A motion for a new trial made on the ground that the verdict is against the weight of the evidence normally presents a question of fact and not of law and is addressed to the discretion of the trial court." *Brown v. McGraw Edison Company*, 736 F.2d 609, 616 (10th Cir.1984). We do not disturb the denial of a motion for a new trial unless there is a showing of a manifest abuse of discretion. *Id.* See also *Trujillo*, 825 F.2d at 1461 (a trial court's decision not to grant a new trial will not be overturned absent a showing of a clear abuse of discretion) (quoting *Ryder*, 814 F.2d at 1424). The standard we use in making this determination is whether the verdict is "clearly, decidedly, or overwhelmingly" against the weight of the evidence. *Champion Home Builders v. Shumate*, 388 F.2d 806, 808 (10th Cir.1967). For the same reasons discussed in the context of the trial court's denial of the defendants' motion for judgment n.o.v., we find no abuse of discretion in the trial court's denial of the motion for a new trial.

AFFIRMED.

APPENDIX